NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Puerto Rican Civil Rights League, Inc., Older Americans Coalition, Wilmington United Neighborhoods, Brandywine Trinity United Methodist Church, Raymond W. Brown, Maria Galindez, for herself and as parent and guardian for her minor children Reynaldo Galindez and Pedro Galindez, Milagro Quinones, Denise Smokes, Maria Miran, on behalf of themselves and others similarly situated, and City of Wilmington, a Municipal Corporation, Plaintiffs,

v.

The WILMINGTON MEDICAL CENTER, INC., Defendant.

Civ. A. No. 76–298.

United States District Court,
D. Delaware.

May 13, 1980.

Douglas A. Shachtman of Community Legal Aid Society, Inc., Wilmington, Del., Marilyn G. Rose and Sanford Newman, Center for Law and Social Policy, Washington, D. C., for all plaintiffs, except the City of Wilmington.

Jeffrey S. Goddess and Jerome M. Capone of City of Wilmington Law Dept., Wilmington, Del., for plaintiff City of Wilmington.

Rodney M. Layton and William J. Wade of Richards, Layton & Finger, Wilmington, Del., for defendant Wilmington Medical Center, Inc.

## OPINION

LATCHUM, Chief Judge.

Once again this Court is called upon to consider the legality of "Plan Omega," the controversial proposal of the defendant Wilmington Medical Center, Inc. ("WMC") to relocate a major portion of its urban hospital facilities and services to a suburban location. The case has been in active litigation before this Court and the Court of Appeals for more than three and a half

years and thus far has spawned eight reported opinions.[1]

In order to understand the issues presently before the Court it is necessary first to review the procedural history of this bitterly contested action.

## I. PROCEDURAL HISTORY

Certain black, Puerto Rican and handicapped individuals, and groups representing similar persons (the "plaintiffs") commenced this action on September 10, 1976, naming as defendants WMC, the Secretary of the Department of Health, Education and Welfare ("HEW"), the Director of the [Delaware] Bureau of Comprehensive Health Planning ("BCHP"), and the Chairman of Health Planning Council, Inc. ("HPC"). The gravamen of the original complaint against WMC claimed that it, as a recipient of federal funds under the medicare and medicaid programs, had violated its obligations to the plaintiffs, beneficiaries of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, by commencing to implement Plan Omega.[2] In addition, plaintiffs alleged that HEW had violated its duty to enforce Title VI and Section 504: (1) by approving Plan Omega under Section 1122 of the Social Security Act, 42 U.S.C. § 1320a–1 ("Section 1122"); (2) by approving regulations thereunder which failed to require that a proposal under Section 1122 comply with Title VI and Section 504; (3) by entering into an agreement with BCHP which failed to ensure that proposals under Section 1122 comply with Title VI and Section 504; (4) by adopting a procedure which prohibited

HEW review of Section 1122 proposals for substantive compliance with Title VI and Section 504; (5) by following such an allegedly improper procedure in approving Plan Omega; and (6) by failing to file an environmental impact statement concerning Plan Omega under the National Environmental Protection Act of 1969, 42 U.S.C. § 4321 et seq. (the "NEPA claim"[3]).[4] Finally, the complaint charged that BCHP and HPC had violated Title VI and Section 504 by not adopting procedures to ensure that proposals under Section 1122 comply with Title VI and Section 504 and by making findings and recommending approval of Plan Omega.[5]

This Court subsequently stayed its actions on the complaint and ordered HEW to conduct a civil rights investigation of plaintiffs' allegations. 426 F.Supp. 919 (D.Del. 1977). That investigation led to a finding that Plan Omega, as then proposed, constituted a *prima facie* violation of Title VI and Section 504.[6] HEW also found, however, that, by giving written assurances in certain areas, WMC could bring Plan Omega into compliance with Title VI and Section 504. Consequently, after negotiations between HEW and WMC, the parties entered into a contract drafted in open-ended, normative language which obligated WMC to modify and supplement those particular features which HEW had determined would otherwise have a *prima facie* discriminatory effect (the "Supplemental Agreement"[7]).

In an opinion filed on April 7, 1978, this Court reviewed HEW's findings and held that HEW's conclusion, that Plan Omega as modified by the Supplemental Agreement would not violate Title VI or Section 504,

---

1. *NAACP v. WMC*, 426 F.Supp. 919 (D.Del. 1977); *NAACP v. WMC*, 436 F.Supp. 1194 (D.Del.1977), aff'd 584 F.2d 619 (C.A.3, 1978); *NAACP v. WMC*, 453 F.Supp. 280 (D.Del.1978), rev'd in part 599 F.2d 1247 (C.A.3, 1979); *NAACP v. WMC*, 453 F.Supp. 330 (D.Del. 1978); *Wilmington United Neighborhoods v. H.E.W.*, 458 F.Supp. 628 (D.Del.1978), aff'd 615 F.2d 112 (C.A.3, 1980).

2. Docket Item ("D.I.") 1.

3. This Court granted summary judgment in favor of HEW on the NEPA claim, *NAACP v. WMC, Inc.*, 436 F.Supp. 1194 (D.Del.1977) and

was affirmed by the Third Circuit Court of Appeals in *NAACP v. WMC, Inc.*, 584 F.2d 619 (C.A.3, 1978).

4. D.I. 1, ¶ 30.

5. D.I. 1, ¶ 31.

6. D.I. 124.

7. Plaintiff Exhibit ("PX") 2. Plan Omega and the Supplemental Agreement are described in greater detail *infra*.

was not arbitrary and capricious. *NAACP v. WMC, Inc.*, 453 F.Supp. 280 (D.Del.1978). This Court further held that the plaintiffs had no right to bring a private action under those statutes and granted summary judgment in favor of the defendants, HEW and WMC.[8] Plaintiffs appealed that decision and the Court of Appeals reversed in part, holding that the plaintiffs did have a private right to a trial *de novo* in this Court on their Title VI and Section 504 claims. *NAACP v. WMC, Inc.*, 599 F.2d 1247 (C.A.3, 1979). The Court of Appeals therefore remanded the case to this Court for a trial on the merits.

Following remand, this Court, in accordance with the mandate of the Third Circuit, dismissed HEW from this action for the purposes of the trial on plaintiffs' private right of action.[9] BCHP, HPC and their respective directors were dismissed from this action by agreement of all parties by court order dated July 17, 1979.[10]

On September 4, 1979, this Court granted plaintiffs leave to file a Third Amended and Supplemental Complaint.[11] This amendment added the City of Wilmington as a party plaintiff and struck those paragraphs relating to HEW in the complaint. Also added were allegations of violations of the Age Discrimination Act of 1975, 42 U.S.C. § 6102 ("Section 6102" claim)[12] and an allegation charging WMC with "intending" the discriminatory consequences alleged under all three civil rights acts.

The trial to the Court sitting without a jury commenced on October 9, 1979, and concluded on November 15, 1979. Some 28 witnesses testified for plaintiffs in their case in chief, 18 witnesses testified for WMC in its case in chief, 3 witnesses testified for plaintiffs in rebuttal, and 4 witnesses testified for WMC on surrebuttal. The trial transcript consists of 3,349 pages of testimony. Over 400 exhibits were introduced into evidence. Post-trial briefing[13] was completed on January 24, 1980, and the case is now ready for final disposition.

This opinion shall constitute the Court's findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

## II. FACTS

The Court finds itself unwillingly cast by this litigation into the role of a modern day Nostradamus. The Court is not being asked to perform those traditional tasks for which courts have a special competence— the determination of facts relating to actual events which have occurred in the past. Rather, the Court is required to prophesy the consequences of events which may or may not occur in the future. Lacking a crystal ball or any other reliable talismanic symbol, the Court must look to the facts as they exist today, the modified plans of WMC, and the conflicting judgments of the medical and social experts who testified at trial in an attempt to pierce the mists that obscure future events.

---

**8.** On June 21, 1978, this Court handed down another opinion, *NAACP v. WMC, Inc.*, 453 F.Supp. 330 (D.Del.1978), which rejected the plaintiffs' claims that HEW's failure to provide the plaintiffs a hearing during its administrative investigation of possible Title VI and Section 504 violations contravened the due process clause of the Fifth Amendment. These due process claims had first been raised by the plaintiffs in their second amended complaint, filed November 22, 1977. (D.I. 197). Although both the June 21 and the April 7 opinions were appealed to the Third Circuit together, the Court of Appeals, because of its finding that the plaintiffs had a right to a trial *de novo* under Title VI and Section 504, found it unnecessary to decide the due process issue.

In a later opinion, handed down in a different but related action, this Court also rejected vari-

ous challenges mounted against HEW's approval of Omega under Section 1122. *Wilmington United Neighborhoods v. United States*, 458 F.Supp. 628 (D.Del.1978), aff'd, 615 F.2d 112 (C.A.3, 1980).

**9.** D.I. 293.

**10.** D.I. 294.

**11.** D.I. 343.

**12.** While not deciding the issue, the Court will assume for the purposes of this decision that the plaintiffs may bring a private cause of action under Section 6102.

**13.** The parties submitted briefs totaling 486 pages. (D.I. 408, 410 & 414).

The Court will begin its prognostications with a description of the present demographic characteristics of New Castle County and the role played by WMC in providing health care today. One must look at this actual world in order to determine first how Plan Omega would differ from the present and, second, what impacts those possible differences might have on the various minorities who are protected by the statutes invoked by the plaintiffs in this case.

### A. WMC And Its Role In Providing Health Care

WMC is the major provider of hospital care services to the people of New Castle County. This privately owned, non-profit corporation has a capacity of 1104 of the 1471 non-profit, acute general hospital beds in New Castle County. That number represents 55% of similar beds in the entire State. In addition, it includes a 60 bed rehabilitation center in New Castle County ("Pelleport") which will not be affected by Plan Omega.[14] Acute hospital care is provided at three "divisions" of WMC—the General, Memorial and Delaware Divisions. All three divisions are located in different areas of the City of Wilmington[15] and are well served by bus routes which run throughout the heavily populated portions of the County.[16] WMC provides both general medical and surgical services and secondary and tertiary hospital care.[17] Many of the latter types of services are provided exclusively by WMC.[18] Indeed, WMC is the sole provider of tertiary hospital care in the State of Delaware.[19]

WMC was organized in 1965 through the merger of three non-profit hospitals—Wilmington General, Memorial and Delaware Hospitals. These three hospitals currently constitute the three divisions of WMC. Two primary reasons prompted the merger: (1) to reduce the duplication of facilities and concentrate hospital care available to the community, and (2) to provide the scope of clinical experience to attract the support of a major teaching university toward a resident program. By 1965, the intern and resident programs at the three independent hospitals had reached a crises point. The programs needed strengthening in order to attract residents who would become physicians and serve in the state and community.[20] These objectives were perceived, and are still perceived, by the doctors on WMC's staff as being best served by placing all the medical and surgical services under one roof. The goal of physical consolidation of all health care services was viewed by the staff in 1965, and at present, as the best method for providing first class hospital care for the residents of New Castle County.[21]

Although the major provider of hospital care, WMC is by no means the only provider of such care to county residents. St. Francis Hospital maintains between 250 to 300 hospitals beds and Riverside Hospital, an Osteopathic facility, operates with a 100 bed capacity.[22] Both of these facilities are lo-

---

14. PX 1, p. 6–7.

15. The locations of the three divisions are shown on the map, PX 299.

16. *See,* Map, PX 305.

17. General medical and general surgical services are the usual medical and surgical services required by mankind, such as the repair of a hernia, a tonsillectomy, or treatment of disease, such as pneumonia, which cannot be treated on an ambulatory or outpatient basis. Secondary and tertiary care involves more specialized and often more capital intensive services, such as intensive care and coronary care units. (Trial Transcript ("Tr") 674–675).

18. PX 1.

19. Tr. 1205.

20. PX 1, p. 6–7; Tr. 1141, 1385–1387.

21. Tr. 1212, 1375, 1449 *et seq.,* 2325.

22. In 1976, St. Francis was a 267 bed hospital and Riverside was a 100 bed hospital. (PX 1, p. 6–2). At that time St. Francis had undertaken an expansion program and planned to have 293 beds in service in 1980. (PX 1, p. 6–2).

The Veterans' Administration Hospital, located at Elsmere, Delaware, just outside the corporate limits of Wilmington, also provides hospital services, but since it serves restricted population groups, it should not be considered in an analysis of the health care available to the

cated in Wilmington. The result of this concentration is that Wilmington has more beds than would be desirable under national standards and the rapidly growing southwestern portion of the County around Newark, Delaware, is grossly underserved.[23] The Newark area is presently served only by an emergency room. The need for hospital facilities in the vicinity of Newark is widely recognized[24] and the Delaware Health Planning Council has recommended that hospital beds be provided to serve that area.[25]

Although the services provided by St. Francis, Riverside and WMC are not the same, the quality of physicians that are available at all three hospitals is roughly equivalent. A majority of WMC's staff have privileges at St. Francis[26] while as many as 60 to 70 WMC physicians are on the consulting staff of Riverside.[27] Riverside is also a teaching hospital qualified by the American Osteopathic Association.[28]

While WMC is, in a sense, one of three operational hospitals in New Castle County, the role played by WMC as a health care provider is quite different from the other two hospitals. All three hospitals provide general medical, surgical and pediatrics services.[29] However, WMC is almost the sole provider of obstetrical services. Riverside has only 2 OB beds[30] and St. Francis has closed its OB unit. WMC is the only provider of many aspects of tertiary hospital care; certain advanced medical treatment facilities, such as x-ray therapy, cobalt therapy, radium therapy, therapeutic radioscopy, and inpatient renal dialysis facilities, are provided only at WMC.[31] Certain subspecialties of medicine are almost exclusively available at WMC.[32]

WMC is the only hospital in the County with a teaching program recognized by the American Medical Association. Because the potential effect of Omega upon the quality and operation of this teaching program has become a major issue in this case, the Court will describe that program at some length.

The witnesses at trial unanimously agreed that continuance of WMC's teaching program was essential to its maintenance of a high quality system of health care to the County and State.[33] First, lacking a medical school, Delaware has traditionally depended upon out-of-state physicians for its quota of doctors. WMC's student and residency program has been one of the primary means of attracting medical students to become physicians to serve the State and the community.[34] Even more important, WMC's residency program is absolutely essential to enable WMC to provide the best

---

whole population of New Castle County. (PX 323, p. 94).

23. PX 1, p. 6–10; PX 323.

24. This need was noted at trial by Newark residents (Tr. 1767–1773), WMC staff members (Tr. 1142–1143, 1165–1168), and by members of WMC's board of directors (Tr. 1406, 1408, 1548).

25. Defendant Exhibit ("DX") 6.

26. Tr. 1166–1167, 1202, 2217.

27. Tr. 1166–1167.

28. PX 1, p. 6–3.

29. PX 1, p. 1–4; PX 323, p. 201.

30. Riverside is served by WMC obstetricians. (Tr. 1149–1150; PX 1, p. 4–1; PX 323, p. 174).

31. PX 1, p. 6–4. St. Francis and Riverside do have some tertiary care capabilities. For example, both have intensive care units ("ICU") and intensive cardiac care units.

32. A discussion of these subspecialties will be undertaken later when the division of services is reviewed under Plan Omega. Only those subspecialties that will be moved to the Southwest site will have an effect on care.

33. PX 1, pp. 6–2—6–3.

34. PX 1, p. 6–7; Tr. 1141, 1385–1387.

medical care possible for its patients.[35] Indeed, without that program, WMC's ability to function as a tertiary care institution would be seriously impaired. Residents are needed to supervise the care of patients whose lives are dependent upon artificial life support equipment. WMC would be unable to maintain facilities such as the surgical ICU or to support highly sophisticated medical procedures such as those performed by the trauma team without a residency program.[36] Furthermore, without the 142 residents it now has, WMC would be unable to provide many health care services for lack of an adequate staff.[37] For example, residents staff the outpatient clinics where a great deal of primary care is provided to indigent and semi-indigent people.[38] In fact, practically all the services are staffed by residents.

While engaged in a residency, a resident, as an integral part of his medical education and training, will rotate among the various services attending to different types of medical problems and patients. These rotations follow variable schedules so that residents will serve at various times on different floors among the four hospitals that make up WMC.[39] As a result, residents are exposed to varied educational experiences and WMC obtains an essential staff. For instance, a second or third year pediatrics resident is always assigned to the Emergency Room to aid its staff in making the often difficult pediatric diagnosis.[40]

WMC has both residents and medical students from The Thomas Jefferson Medical School in Philadelphia in its educational program. Medical students require a great deal of supervision but as the student progresses and proves his or her ability to handle responsibility less and less supervision is required.[41] At the clinics and on night duty residents frequently attend patients without staff physicians even being present. Naturally, if a complicated problem arises, the resident may consult with a fully trained board certified physician.[42] Supervision of residents and medical students by board certified physicians is essential to the ability of these doctors-in-training to deliver quality care. As a general proposition inadequately supervised students and residents will undergo an inferior educational experience and deliver an inferior quality of health care.[43]

WMC also differs from the other hospitals in New Castle County in the amount of free care which it provides. It is the largest provider of free care in the County to those who are both unable to pay for care themselves and unable to qualify for government assistance. To this end, WMC spends approximately $8,000,000 a year, a figure which represents 9.2% of all patient care provided by the institution.[44] This care is subsidized entirely from endowment funds and funds which are derived from higher rates that are charged to paying patients and their private insurers. Partly as a result of this subsidization, WMC's hospital rates are the highest in the State of Delaware.[45]

WMC is also unique in the type and scope of outpatient services which it provides, in particular, its clinics. WMC provides both primary care clinics and certain specialty clinics. The primary care clinics, which

35. Tr. 1228–1229, 2325, 1386–1387.

36. Tr. 1230. A trauma team is a group of highly trained medical specialists who are available 24 hours a day to provide immediate care for patients who have suffered massive trauma. (Tr. 2236–2238).

37. Tr. 1387.

38. Tr. 1925–1927.

39. Tr. 1936–1939, 2628 et seq.

40. Tr. 2313–2318.

41. Tr. 1926–1929.

42. Tr. 1928–1930, 1955–1960.

43. Tr. 896–911.

44. Tr. 1374, 2719.

45. Tr. 2723. Medicare and Medicaid will not reimburse WMC for any portion of its fees which may be due to the subsidization of free care. Thus, the entire burden of free care falls upon paying patients and WMC's endowment funds. (Tr. 2719–2720).

WMC maintains in all major medical specialties, along with the Emergency Room, are used by the poor in much the same way as more affluent people use the services of a private physician.[46] Given the importance of primary care as a means of detecting an illness in its early stages or preventing an illness from occurring, if the clinics offer a poorer quality of care under Omega or if their organization is changed so as to discourage their use (if "barriers" arise), the quality of the health of the poor in general, and minorities in particular, may very well suffer. WMC maintains a second type of clinic, its specialty clinics.[47] These clinics are used by all socio-economic classes. Patients are referred to a specialty clinic by their primary care physicians. These clinics often require sophisticated equipment for diagnosis and treatment.[48]

WMC's ability to provide all of the services just discussed is hampered at the present time by an inadequate physical plant. The numerous inadequacies of that plant threaten both the Center's ability to continue its all-important educational program and its ability to maintain in the future the high quality of care which it presently delivers. The fragmentation of programs which is caused by the physical dispersal of the hospital has a present adverse effect both upon patient care and upon the teaching program. Because a whole patient is treated and not a specific organ, it is important to have specialists trained in the diagnosis and treatment of the ailments of all parts of the body available at the site where care is rendered. Similarly, interaction with physicians and residents in other specialties is important for the education of residents.[49] The fact that WMC presently has its services split among three buildings reduces this type of interaction. For these reasons, the staff and all who expressed an opinion on the matter agreed that the optimal situation would be a hospital under one roof.[50]

WMC's present buildings also lack research facilities and adequate conference space. Both are necessary for a high quality residency program. The lack of research facilities has caused WMC's surgical residency program to be put on probation by its accrediting body.[51]

Finally, WMC's physical facilities are aging and in various states of disrepair.[52] Moreover, because of changes in hospital standards that have occurred since the buildings were constructed, the facilities are presently not in compliance with the State's hospital licensing law.[53] The poor state of WMC's buildings has hampered the hospital's ability to recruit high quality residents.[54] However, the most serious problem posed for WMC by its deteriorating facilities is the possibility that they could cause it to lose its accreditation. On the last two occasions that WMC was evaluated by the Joint Commission on Accreditation of Hospitals, it received only one year "probational" accreditations. It has not been granted full accreditation because of various deficiencies in the hospitals' physical plants. If WMC should receive three one-year accreditations in succession, it would be reviewed intensively to determine whether it should lose its accreditation entirely. If WMC were to lose its accreditation, the AMA would no longer qualify its educational program. Loss of AMA qualification would effectively destroy that program. Loss of accreditation could also result in a loss of Medicare and Medicaid funds.[55] A loss of these funds would effectively destroy WMC financially. In 1975,

46. Tr. 670–672.

47. Tr. 723–733, 857 *et seq.*, 2273.

48. Tr. 671–672, 2133–2137.

49. Tr. 684 *et seq.*, 1939.

50. Tr. 684–688, 1205, 1210, 1382–1384, 2158-2159, 2325–2328.

51. Tr. 2209–2212.

52. Tr. 1607–1609.

53. Tr. 1745.

54. Tr. 1943–1945, 2208–2209.

55. Tr. 1376–1377, 1686–1692; DX 15; DX 15A.

$19.4 million, 38% of WMC's income, was derived from Medicare and Medicaid.[56]

Thus, WMC is presently under the compulsion of both law and necessity to bring its three major divisions into compliance with various code standards. The estimated cost of doing so in 1976 was in excess of $20 million. These renovations would also cause WMC's bed capacity to be reduced by 200 beds. WMC would consequently lose any associated revenues.[57] Moreover, without the construction of any new facilities, the community would suffer a shortage of acute care hospital beds. All this would be required to maintain the wholly unsatisfactory three-roof situation.

### B. Plan Omega

#### 1. *Division of services*

Under Plan Omega, two of WMC's deteriorated facilities, the General Division and the Memorial Division, will be closed entirely. The Delaware Division will be reduced from its present 480 beds to 250 beds.[58] This reduction in capacity will be due almost entirely to the elimination of "nonconforming" beds and the use of that space for other functions, such as administrative office space. Finally, a new 780 bed hospital will be built on a site south of Stanton, Delaware ("Southwest Division" or "Stanton Division"),[59] located 9.35 miles southwest of the Delaware Division.[60] The site is located in a rural area with virtually no population living within a mile of it. It is presently served by neither bus routes nor any other form of mass transportation. A representative of the Delaware Area Regional Transportation Authority ("DART") testified that DART has no present plans to establish bus routes to the site even if a hospital were built there.[61]

Omega involves more than simply closing beds in the city and moving them to the suburbs. Some major hospital services will be located exclusively at Stanton while others will be located exclusively at the Delaware Division.[62] Included among the inpatient services which will be located exclusively at the Southwest Division are all obstetrical, gynecological, and pediatric services,[63] certain subspecialties of medicine such as oncology, gastroenterology, nephrology, and neurology,[64] and certain subspecialties of surgery such as neurosurgery, orthopedic surgery, and thoracic surgery.[65] Some clinic, outpatient, and support services will also be located exclusively at Stanton, including the high-risk prenatal and specialty pediatric and gynecological clinics, and the specialty cardiac, radiation therapy and hemodialysis support services.[66] The Delaware Division will exclusively house the psychiatry, ear, eye, and nose, and dentistry specialties. The primary care clinics will be consolidated and located exclusively at the Delaware Division.[67] Thus, with the exception of the few lightly utilized specialty clinics mentioned earlier, all clinics will be located at the Delaware Division.

56. D.I. 311, ¶ 15; D.I. 356, ¶ 15.

57. PX 1, pp. 6–11—6–12.

58. Since the number of beds varies in different documents, all numbers are approximations. Planning on Omega has gone into limbo during the pendency of this litigation. Consequently, no plans or estimates are final.

59. PX 1; PX 2. For the location of the Southwest Division, *see* PX 299.

60. PX 54g, p. 138.

61. Tr. 918–920. However, if significant demand should arise after the construction of the hospital, DART would study the feasibility of establishing bus lines to and from the site. *Id.*

62. The actual division of services has been set out in an earlier opinion. *NAACP v. WMC, Inc.*, 453 F.Supp. 280, 286–87, n.14 (D.Del. 1978). Only a brief overview of the division of services will be given here.

63. PX 24c; PX 2, Appendix A, pp. 4–5. Actually, as noted below, two pediatric holding beds will be maintained at the Delaware Division as well as equipment capable of handling emergency treatment of all specialties.

64. PX 2, Appendix A, p. 4.

65. PX 2, Appendix A, p. 5.

66. PX 24c.

67. PX 1.

A number of services will be provided at both facilities. Both will provide general medical and general surgical services on an inpatient basis, the bed capacity for these services being 154 at the Delaware Division and 451 at the Southwest Division.[68] Both will also have a family practice service which provides general medical service.[69] Both facilities will be tertiary care institutions, and certain forms of tertiary care will be duplicated in the two. For example, both will house fully staffed and equipped [70] medical and surgical Intensive Care Units and Intensive Coronary Care Units.[71] Both will even include pediatric intensive care units (also called intensive care nurseries). Thus, even though the pediatrics service will be located at Stanton, both divisions will be able to treat pediatric emergencies.[72] Both will have operating rooms fully equipped with all the latest materials and devices, including such highly sophisticated equipment as a CAT scan.[73] Finally, both divisions will house Class I Emergency Rooms [74] and various necessary support services, such as diagnostic x-rays.[75] The Emergency Rooms will be fully equipped to handle any and all surgical, medical, pediatric, gynecological and obstetrical emergencies.[76]

### 2. Effect of the Supplemental Agreement

Omega cannot be considered without reference to the Supplemental Agreement entered into by HEW and WMC for the purpose of assuring that Omega would have no discriminatory impacts. That agreement will govern the operations of WMC under Omega.[77] For the purposes of this Court's predictions of the future effects of Omega, it finds that, where the Supplemental Agreement imposes what the Court has designated "categorical obligations" (see below), WMC will meet those obligations. Consequently, in these areas, the contract itself is found to be the best forecaster of future events.

Much of the evidence adduced by the plaintiffs was presented to demonstrate that certain means prescribed by the Supplemental Agreement would not achieve the ends which were required by that contract. To the extent that plaintiffs have adduced such evidence, this Court finds it irrelevant. In presenting their arguments, the plaintiffs have failed to take into consideration the fact that the contract, without distinguishing between the two, imposes two different types of obligations. Some obligations are categorical ones ("categorical obligations") which must be achieved in order to maintain compliance with the civil rights statutes. Others are merely plans of action ("minimal obligations") prescribed solely for the purpose of achieving the categorical obligations. In general, the contract provides that if, after implementing the prescribed minimal obligations, WMC still fails to meet the categorical obligations, WMC will have to take additional actions to enable it to meet the categorical obligations. Plaintiffs adduced a great deal of evidence for the purpose of showing that the minimal obligations would not achieve the categorical obligations, completely ignoring the fact that the contract would require revisions of the minimal obligations

68. PX 24c, p. 12.

69. Pretrial Order, Appendix A, p. 5(a).

70. Tr. 2214.

71. PX 24c; Tr. 2214–2215.

72. Tr. 2321–2322; PX 24c, p. 4.

73. Tr. 2214–2215.

74. A Class I Emergency Room, as defined by the American College of Emergency Physicians, is an emergency room which is staffed 24 hours a day by emergency physicians and specially trained nurses. It has all the equipment

necessary for resuscitation of severe cardiac illness and trauma and adequate in-house backup in all major specialties (i. e., surgery, medicine, pediatrics, anesthesia, etc.); more highly specialized physicians, such as neurologists and neurosurgeons, must be within 30 minutes call to the hospital. Tr. 2372–2374; Tr. 2263–2264; PX 1, Ex. B.

75. PX 24c.

76. Tr. 2154.

77. PX 2.

in order for WMC to meet the categorical obligations of the contract.

An example of the interplay between the various types of obligations in the Supplemental Agreement is presented by the requirements relating to racial identifiability. The Supplemental Agreement imposes upon WMC the categorical obligation to prevent either division of the hospital under Omega from becoming racially identifiable.[78] To achieve that end, the Supplemental Agreement prescribes other minimal requirements. It both requires a certain division of inpatient services between the two divisions and requires that for services offered at both divisions a patient be offered admission first to the Division closest to his or her home as determined by ZIP codes.[79] The agreement further provides that if, at any time, compliance with these minimal obligations does not result in the achievement of the categorical obligation that neither division become racially identifiable, "WMC shall have 180 days thereafter to remedy said racial identifiability by whatever means necessary." Failure to remedy said racial identifiability is deemed a *prima facie* violation of Title VI.[80] Thus, the testimony adduced by plaintiffs in an attempt to show that the present inpatient utilization plan (one of the minimal requirements) will produce racial identifiability[81] is simply irrelevant to the possible occurrence of future events, because, if plaintiffs' predictions occur, the contract requires new remedial actions on the part of WMC. For that reason, the Court must find that neither division will become racially identifiable under Omega. Similarly, in other cases where the contract imposes categorical obligations, the Court finds that WMC will comply with those obligations.[82]

The plaintiffs nevertheless argue that WMC will somehow avoid the contract's categorical obligations. The Court disagrees. The obligations cannot be avoided if avoidance would create a discriminatory impact. The obligations are imposed without temporal limit, extending indefinitely into the future. They are imposed "regardless of cost." In addition, any failure to comply with either the minimal or categorical obligations is automatically considered:

> a prima facie violation of said Title VI and/or said Section 504, and will further constitute grounds for the termination of other federal assistance.[83]

The contract also provides that HEW can monitor WMC's activities, thus assuring that, if WMC does not meet its obligations, sanctions will be applied. WMC is required to keep and to submit on a regular basis numerous records and reports which will enable HEW to ascertain whether the hospital stays in compliance with the Supplemental Agreement and that none of WMC's operations becomes discriminatory.[84] Furthermore, many of the terms of the Supplemental Agreement are drafted in such open-ended and normative language that HEW will be afforded an ample opportunity to intervene if any WMC practice, not explicitly covered by the Supplemental Agreement, should appear to the agency to have a discriminatory impact. The contract's requirements may only be altered with the concurrence of HEW and then only in the event that changes occur in the community's systems for the delivery of health care and/or changes occur in community needs.[85]

Plaintiffs have also argued that HEW would excuse WMC from compliance with

---

78. PX 2, ¶ 6. A division will be deemed to be racially identifiable if it shows "in excess of a 25% minority inpatient utilization" based upon patient days.

79. It also requires that ambulances be instructed to transport patients to the nearest WMC emergency room from the point of origin. PX 2, ¶ 5.

80. PX 2, ¶ 6.

81. *See, e. g.*, testimony of Michael L. Ziegler, Tr. 563–633.

82. Of course, if an obligation were physically impossible to meet, the Court could not find that it would be met.

83. PX 2, ¶ 15.

84. PX 2, ¶ 9.

85. PX 2, ¶ 14.

the Supplemental Agreement in the event that the hospital met with financial difficulties. The Court cannot assume that the agency would act in a manner contrary to its statutory duties or authorize any practice or practices having a discriminatory impact. The Court must conclude that the agency will closely scrutinize WMC's operations and will enforce both the contract and the civil rights acts with due diligence.[86]

### 3. Requirements of the Supplemental Agreement

The Supplemental Agreement imposes both minimal and categorical obligations in a number of other areas. Those requirements will be briefly summarized at this point.[87]

Perhaps one of the most important provisions of the Supplemental Agreement in terms of the effect on the quality of patient care that will be rendered by WMC under Omega is the provision which requires WMC to operate the Delaware Division and the Southwest Division on a unitary basis. WMC must maintain a unitary medical staff, a unitary teaching program, a unitary administration and wholly unitary finances.[88] The requirement of a unitary medical staff and unitary teaching program with rotations of residents required between the Delaware and the Southwest Divisions ensures that the quality of physicians serving the two divisions will be equal. The effect of this upon the relative quality of care between the two divisions is obvious.

The Supplemental Agreement also contains provisions requiring certain changes and controlling other possible future changes in WMC's physical facilities. The agreement imposes upon WMC the categorical obligation "to complete renovation of the Delaware Division, *regardless of cost*, within three (3) years of the date on which the construction of the Southwest Division is completed" (emphasis added), and imposes the minimal obligation that WMC set aside $2.8 million to be devoted exclusively to that renovation.[89] The agreement also requires that before taking any actions that would individually or *cumulatively* expand the service capacity of the Southwest Divi-

---

**86.** In fact, under both the Supplemental Agreement and the civil rights statutes, HEW has a much wider range of possible control strategies than does the Court. *See, generally*, 45 C.F.R. §§ 80, 84, and 90. While the relief requested in the present case and the nature of the evidence presented would allow this Court only to enjoin a particular course of action, HEW, on the other hand, can impose a wide range of affirmative remedies. Moreover, HEW has a great deal of flexibility to vary any requirements if changing circumstances would so warrant. Indeed, the institutional competence of HEW is much greater for this essentially administrative task than that possessed by a court. *See, Atlantis Community, Inc. v. Adams*, 453 F.Supp. 825 (D.Colo.1978). Although the role of the courts has expanded greatly in recent years, this expansion has not and should not lead to the eclipse of the administrative functions of the executive branch. In the instant case, as is generally true, the appropriate function of the court should be to review administrative action carried out by the executive branch, not to undertake that administrative function itself. *See, Hayburn's Case*, 2 Dall. 408, 1 L.Ed. 436 (1872).

**87.** In *NAACP v. WMC, Inc.*, 453 F.Supp. 280, 310–330 (D.Del.1978), this Court had occasion to describe the terms of the Supplemental Agreement in detail.

**88.** PX 2, ¶ 7.

**89.** PX 2, ¶ 12. Failure to complete renovations within the three year period will constitute a *prima facie* violation of the civil rights acts. This categorical obligation differs somewhat from other obligations imposed by the contract in that since the term "renovation" is totally undefined, there is uncertainty as to the exact nature of the obligation. WMC has taken the position that it is required only to renovate those areas relating to patient care in such a way as to make the Delaware Division equal to the Southwest Division in its capacity to deliver such care. It further contends that all such renovations can be completed with the expenditure of the $2.8 million which it must set aside. The plaintiffs, on the other hand, contend that the two divisions must be made equal in all respects, even where a renovation in the Delaware Division would not be cost effective and, in the judgment of plaintiffs' own expert, ought not be made. The Court believes that a rule of reason should prevail and that the renovations *intended are those that will assure equal ability* to deliver patient care in surroundings that are equally safe and pleasant.

sion or reduce the service capacity of the Delaware Division by 5%, WMC must submit plans for those actions to HEW to allow that agency to determine whether the action would be consistent with the civil rights acts.[90] Thus, the agreement forecloses the possibility that even incremental changes in the relative distribution of beds could occur without review for compliance with the civil rights acts. Consequently, plaintiffs' fears that WMC can and will allow the gradual decline and eventual closing of the Delaware Division can never become a reality, absent some major change in either the health care systems or demographic patterns of New Castle County.

A third important aspect of the Supplemental Agreement is its requirements regarding transportation to and from the Southwest Division. The agreement contains categorical obligations that WMC provide "free" and "adequate" transportation for patients, visitors, and employees between the Delaware Division and the Southwest Division and that that transportation "be equipped to provide convenient service to the handicapped."[91] To this end, the agreement imposes the minimal requirements that WMC maintain in operation four 20–30 passenger buses (not less than two equipped to provide convenient service to the handicapped), three ambulances, and two van-type station wagons (both equipped to provide convenient service to the handicapped). Those vehicles must be maintained in a shuttle service running every 15 minutes between the Southwest Division and the Delaware Division during specified hours. The availability of this transportation system generally[92] and the availability of transportation to the handicapped, in particular,[93] must be advertised both in English and Spanish.

Besides requiring that WMC provide transportation that is convenient to the handicapped, the agreement also requires that the Southwest Division be built and the Delaware Division be renovated so as to be accessible to the handicapped as mandated by Section 504.[94]

The requirement that WMC allow neither division to become racially identifiable has already been discussed.[95] WMC has also agreed to pay particular attention to the need for employment opportunities for urban minority groups,[96] and to take into account these needs in its employment policies under Omega. Finally, the agreement calls for the appointment of a bilingual ombudsperson to receive and to act upon any complaints relating to discrimination.[97]

## C. The Present And Future Socio-Economic And Demographic Characteristics Of New Castle County

The final set of facts needed in order to project the impact of Omega consists of the present and future social, economic and demographic characteristics of the area which WMC serves. In all probability the future characteristics will not differ in any significant respect from the present characteristics. Dr. Harold Brown, the chief demographer in the State of Delaware for the past twenty years, testified without contradiction that the statistics found in the 1970 census are reasonable reflections of the current socio-economic picture[98] and that this picture should remain unchanged through the 1980's.[99]

### 1. Distribution and economic status of minority, elderly and handicapped populations of New Castle County

The minority and elderly populations of New Castle County are concentrated heavi-

---

**90.** PX 2, ¶¶ 10 and 11.

**91.** PX 2, ¶ 1.

**92.** PX 2, ¶ 4.

**93.** PX 2, ¶ 2.

**94.** PX 2, ¶ 8.

**95.** PX 2, ¶ 6.

**96.** PX 2, ¶ 13.

**97.** PX 2, ¶ 3.

**98.** Tr. 112.

**99.** Tr. 114–115; Dr. Brown admitted that projecting population changes in Delaware because of its small geographical area is difficult. (Tr. 94–95).

ly in the City of Wilmington and those ZIP codes assigned to the Delaware Division for duplicated services under Plan Omega.[100] These population groups are thus concentrated in areas that are quite close to the Delaware Division and the other two present divisions of the Wilmington Medical Center.[101] These groups are overwhelmingly and disproportionately low-income in relation to the total population of the County[102] and comprise the bulk of households in the County that are without access to private means of transportation.[103]

Of the blacks in New Castle County, 72% live in the Wilmington/Elsmere area, while another 14% live in the Southbridge/New Castle corridor.[104] Approximately 80 times as many blacks live within 2.5 miles of the Delaware Division as live within 2.5 miles of the proposed Southwest Division.[105] Data developed by WMC shows that the minority population using WMC is similarly distributed. In the 90–day period between December 1, 1976 and February 28, 1977, some 76% of WMC's minority inpatients (black and Puerto Rican)[106] and 81.8% of WMC's minority service employees[107] lived in the Wilmington/Elsmere area.

The elderly[108] comprise 7% of the population of New Castle County.[109] About 12 times as many elderly people live within 2.5

miles of the Delaware Division as within 2.5 miles of the Stanton site.[110] A total of 76.3% of the elderly live in communities located in northern and eastern New Castle County, 38.9% live in the City of Wilmington alone. In contrast, only 5.9% live in the Greater Newark area.[111] Dr. Brown predicted that the elderly population would remain more or less in the same location with some increase occurring in the Brandywine Hundred, an area north of the City of Wilmington.[112] The general past emigration from the City of Wilmington did not include the elderly who tended to remain because of their inability to afford to go elsewhere and because of the concentration of public housing for the elderly in Wilmington.[113]

Absolutely no credible evidence has been developed in this case concerning the distribution of handicapped people in New Castle County. Plaintiffs have argued that uncontradicted testimony that the elderly have a disproportionately higher incidence of mobile limiting handicaps[114] will also establish the proposition that the distribution of the handicapped population mirrors the distribution of the elderly.[115] To make such an extrapolation upon such meager evidence would be totally unwarranted.[116] Since the

---

**100.** PX 23; PX 23b; PX 45a; PX 176.

**101.** Pretrial Order, Appendix A, ¶ 1(1), (i), (j), and (k).

**102.** PX 45d; PX 176.

**103.** PX 45c; PX 301; PX 302.

**104.** PX 45a, p. 48; *see also*, PX 23(a).

**105.** Pretrial Order, Appendix A, ¶ 1(g).

**106.** PX 207; PX 23d.

**107.** PX 207; PX 23h. Service employees include registered nurses, licensed practical nurses, aides, orderlies, service workers, and building maintenance workers.

**108.** As used herein, the term "elderly" refers to people aged 65 years and older.

**109.** Pretrial Order, Appendix A, ¶ 1(1).

**110.** *Id.*, Appendix A, ¶ 1(i); PX 23b.

**111.** PX 45a, p. 47.

**112.** Tr. 114–115.

**113.** Tr. 109–110.

**114.** Tr. 740–741.

**115.** D.I. 408, p. 8, n. 3a, pp. 36–39, n. 19.

**116.** While the fact that the elderly are disproportionately handicapped means that the handicapped are disproportionately elderly, it does not lead to the conclusion that the handicapped are predominantly elderly or to the conclusion that the elderly can be used as a surrogate for the handicapped. An examination of some statistics readily reveals why the plaintiffs' extrapolation cannot be made. According to PX 176, the elderly population of New Castle County is 38,530 while the rest of the population numbers 460,963. (PX 176, Table P–1). This works out to a ratio of 11.96 non-elderly to 1 elderly person. Even if an elderly person were six times as likely as a non-elderly person to be

plaintiffs bear all burdens of proof on the issue of impact, the Court must assume that the distribution of the handicapped in New Castle County mirrors the distribution of the population as a whole.

The black and elderly populations of New Castle County are also disproportionately low income. If one divides the income range of New Castle County into terciles, about 61% of the black households are in the bottom tercile compared to 30% of the white households.[117] The elderly, who compose only 7.7% of the total population of New Castle County,[118] account for 15.8% of the population with income below the poverty level.[119]

### 2. Transportation characteristics of New Castle County

In New Castle County, as in the United States as a whole, by far the predominant means of transportation is the private automobile. The County and the State as a whole are well served by the state highway system. Most people in the State with access to an automobile can easily reach medical facilities.[120] Indeed, in a survey of inpatients arriving at WMC, it was determined that 79% of WMC's patients arrived in an automobile driven by the patient, a friend, or a member of the family.[121]

Emergency ambulance service is also available throughout the State of Delaware and County ambulance service is readily accessible to all residents of New Castle County.[122] A privately owned non-emergency ambulance service based in Wilmington also provides transport but at a very high cost.[123] In the survey of inpatient modes of transportation, 16.7% of WMC's inpatients arrived by ambulance.[124]

The Southwest Division will be located in an area which is readily accessible to Interstate I–95.[125] Given that fact, it will be readily accessible to that vast majority of WMC's patients who arrive by ambulance or by private automobile.[126]

The picture is not as bright for the 3% of WMC's inpatients who must rely upon other means of transport. That 3% is predominantly composed of minority and elderly individuals living in or near the City of Wilmington. Of the 16,000 households in the County which lack access to automobiles,[127] 73.8% are in the Wilmington/Elsmere area while only 12.3% are in the southwestern part of the County.[128] Altogether, 38% of Wilmington's households lack access to automobiles while only 4% of Greater Newark's households lack such access.[129] Of the households without cars in

---

handicapped, only one third of the handicapped population would be composed of elderly people. Since 66% of the elderly population lives in the Wilmington/Elsmere area and the northern suburbs (D.I. 408, pp. 36–37), plaintiffs have shown only that at least 22% of the handicapped live in areas closer to the Delaware Division. Even if the elderly were 10 times more likely to be handicapped, plaintiffs would have shown only that 30% of the handicapped live closer to the Delaware Division. Table 14 of DX 3 contains statistics showing the distribution of mobility limitations among different age groups. From these figures, one can derive the facts that only 31% of those who are limited in activity are elderly, 29.8% of those limited in amount or kind of major activity are elderly, and 53.6% of those unable to carry on major activity are elderly. Thus, given the 66% figure, plaintiffs have succeeded only in showing that 20.7%, 19.7%, and 35.4%, of those categories, respectively, live nearer to the Delaware Division than to the Southwest Division.

117. PX 45d.

118. PX 176, Table P–1.

119. PX 176, Table P–4.

120. PX 323, p. 37.

121. DX 25, Table (D).

122. PX 323, p. 37; Tr. 2157.

123. PX 323, p. 37.

124. DX 25, Table (D).

125. *See*, location on PX 299.

126. 97% of WMC's inpatients arrive by private vehicle (DX 25, Table (D)).

127. PX 45c.

128. PX 201.

129. PX 45c.

Wilmington/Elsmere and the northern suburbs, 71.3% are non-black elderly or blacks of all ages.[130] Those people who lack access to automobiles and who do not qualify for the use of an ambulance must rely upon public transportation, private organizations or some other limited options.

The major public transportation system in New Castle County is the public bus system, DART, the Delaware Authority for Regional Transit.[131] DART has no present or presently proposed routes which will serve the Southwest Division site.[132]

DART is the only form of public transportation in New Castle County that operates on regular routes. Other transportation is demand oriented. Taxicabs are unreliable[133] and expensive. A round trip from the Delaware Division to the Southwest Division costs approximately $15.00.[134]

Another transportation resource, which under state law is only available to those handicapped and elderly individuals who are unable to use other modes of transportation, is the Delaware Authority for Specialized Transportation ("DAST").[135] DAST contracts with various agencies to provide transportation which is paid for by those agencies.[136] WMC has not contracted with DAST to provide such services for its patients, visitors or employees.[137] A DAST representative testified that if DAST were required to transport many of those it now takes to the various divisions of WMC to the Southwest Division, the greater distance and lesser ability to provide multipurpose trips (the inner city locations are near many other services used by the handicapped) could strain DAST's resources and reduce its services to the handicapped.[138] However, given the fact that WMC, under the Supplemental Agreement, is required to provide a free shuttle between the Delaware Division and the Southwest Division equipped to transport handicapped, the Court finds that this overload will not develop.[139]

Other transportation and escort services are also presently provided by volunteers[140] or senior citizen centers.[141] Because of the greater distances involved, these services may not be provided for people going to the Southwest Division.[142] However, many, if not most, of the trips provided by these sources are for the purpose of clinic visits.[143] Since the clinics will not be moved, this source of transportation presumably will still be provided for that purpose. There are also some large well established volunteer organizations which presently provide transportation to hospitals and will probably remain undeterred by any possible extra distance to the Southwest Division. The American Cancer Society will transport cancer patients to and from treatment. The American Red Cross provides weekday transport.[144]

Finally, WMC itself has for years been providing transportation among its three

---

**130.** PX 301, Table 4.

**131.** Its routes are shown on the map, PX 305.

**132.** Pretrial Order, Appendix A, ¶ 4(b). Of course, such routes may be established at some time in the future if demand so warrants. (Tr. 918–920).

**133.** Tr. 245.

**134.** Current taxi fares in New Castle County are $.95 for the first one-seventh of a mile and $.10 for each additional one-seventh of a mile thereafter. (Pretrial Order, Appendix A, ¶ 8, v.)

**135.** Tr. 520–521.

**136.** Tr. 521.

**137.** Tr. 522.

**138.** Tr. 530–531.

**139.** *See* description of the transportation required by the Supplemental Agreement, *supra. See also*, the Court's findings on transportation impacts upon the handicapped *infra*.

**140.** Tr. 553.

**141.** Tr. 538, 835.

**142.** Tr. 542, 556, 839.

**143.** Tr. 545–546.

**144.** PX 323, p. 38.

city divisions.[145] The Center presently provides free ambulance service among its four present divisions, and because of the split of its services, has developed a great deal of expertise in transporting even very ill patients. For example, WMC has the present ability and sophisticated equipment needed to transport an abnormally small baby delivered in an Emergency Room over long distances with no adverse effects.[146]

Of course, under the Supplemental Agreement, WMC will also have to operate the free shuttle described earlier. This shuttle must fill any hospital related transportation demand that the sources just discussed fail to meet. The Court finds that WMC will do so.[147]

### 3. Health needs of minority groups and the elderly for the services being relocated exclusively to the Southwest Division

Minorities and the elderly have a disproportionately high need for many of the services which will be located exclusively at the Southwest Division under Omega. A number of witnesses for the plaintiffs questioned the rationality of locating those services which are most needed by minorities outside of the city and reached the conclusion that because of the relocation the health of the minority populations would suffer relative to the white population.[148]

The best example of this particular aspect of Omega is presented by those services relating to childbearing and the health of infants.[149] The high-risk obstetrics clinics, special pediatric clinics, and all obstetrics, gynecology and pediatric (except for two holding beds) inpatient services will be located at the Southwest Division.[150] These services are among those that are most heavily used by minorities. For example, while minorities comprise only 13% of the New Castle County population, they represent 33% of the patient days in pediatrics, 24% of the patient days in obstetrics, and 45.9% of the patient days in the premature nursery.[151]

Certain socio-economic factors are primarily responsible for the disparate needs of minorities for these services.[152] First, the evidence indicated that minority teenagers are more likely than white teenagers to become pregnant, and that teenage mothers have a substantially higher risk of adverse pregnancy outcome than do other mothers. This is so, according to the testimony, because adolescents are, in general, very poor users of health care, tending not to seek primary medical care in the early stages of pregnancy and tending to miss appointments even once such care has been initiated.[153] As a result, babies of teenage pregnancies have significantly higher inci-

---

**145.** Tr. 1452; PX 1, p. 6–8; PX 68, p. 13; PX 68, F–4.

**146.** Tr. 2320–2321.

**147.** Tr. See, transportation impacts discussion, infra.

**148.** See testimony of Dr. John Levinson (Tr. 1143–1149), Dr. Samuel Wolfe (Tr. 761–762), Dr. Janet Baillie Hardy (Tr. 879–887) and Dr. Albert Gelb (Tr. 1205–1206). The Court has, of course, found otherwise. Many of the opinions were premised on misunderstandings of WMC's present situation and of its plans for Omega.

**149.** The location of obstetric and pediatric inpatient services at the Southwest Division is the "catch-22" of the Omega Plan. Given the heavy minority utilization of these services, their location in the Delaware Division would contribute considerably to the racial identifia-

bility of that division. Such racial identifiability can best be avoided by locating those services in the suburbs. However, this solution results in the location of those services most needed by the inner city population in the location farthest away from that population. Plaintiffs contend that because of this, Omega is inherently flawed and could only be made nondiscriminatory by a different allocation of bed numbers. Defendants claim that other measures which have and will be taken not only obviate the problems but will result in a marked improvement of care.

**150.** Supra.

**151.** PX 43; Tr. 620.

**152.** Tr. 714–715, 718–719, 725, 727–733.

**153.** Tr. 849.

dences of perinatal death, mental retardation, and other neurological problems.[154]

A second factor contributing to the greater need of minorities for obstetrical and pediatric services is the fact that black and hispanic women tend to bear more children than do their white counterparts.[155] This in and of itself helps to account for the higher minority utilization of obstetrical and pediatric services. This factor, however, also increases minority need for these services in another way. Women who bear children when they are over 35 years of age or are in their fourth or subsequent pregnancy are at especially high risk of having complications in their pregnancy or childbirth.[156]

The testimony also indicated that minorities are also more likely than whites to have certain diseases, such as organic heart disease, pneumonia, diabetes, and hypertension, which increase pregnancy risks.[157] Moreover, since minorities are more likely than whites to fail to obtain early care during pregnancy, these diseases are more likely to result in pregnancy complications in minorities than they are in whites.[158]

As a result of all of these factors, the testimony indicated that minorities as a group are much more likely to be at higher risk than are whites. Overall, only 20% of white mothers but 40% of black mothers fall into the high risk category.[159]

These differences are reflected both in the higher relative minority presence in the WMC services relating to obstetrics and pediatrics noted earlier and in national and state health statistics. National infant mortality rates show a differential related to race with black infants showing significantly higher rates of newborn and infant death than white infants.[160] Out of every 1000 black legitimate live births, 39.5 die in the first year of life while only 20.8 out of every 1000 white births die during that period.[161] In Delaware, the neonatal death rate for minorities was more than twice that for Caucasians in 1977 (14.6 versus 6.8 per thousand) and later infancy death was three times as high for minorities in that year (6.0 versus 2.0 per thousand).[162]

Minorities also have a disproportionate need for services related to cerebral vascular diseases and for those related to the treatment of cancer. Neurosurgery, special cardiovascular laboratories, nephrology (cerebral vascular related services) and radiation therapy and oncology (cancer related) will all be located exclusively at Stanton.[163] The disparate needs of minorities for these services is demonstrated by national statistics. Minorities have an age adjusted death rate from cerebral vascular diseases of 91

154. Tr. 848.

155. Tr. 867.

156. Tr. 861–863, 894.

157. Tr. 862–863.

158. Tr. 867–876. While this description is framed in terms of comparisons between minorities and whites, it would be more accurate to frame it in terms of comparisons between economic classes. The characteristics attributed to whites are actually those of the well-to-do while those attributed to minorities are actually those of the poor. If one compared minority and white groups from identical socio-economic niches, the differences in infant mortality rates would be practically no different with the exception that even then minority infants would be somewhat more likely to be classified as premature. (Tr. 714, 718–719). Because minorities are more likely than whites to be poor, differences caused by socio-economic factors appear as differences between the races.

One might question whether impacts for which poverty is primarily responsible can be considered adverse impacts under Title VI. The short answer to this is that in the United States, both now and at the time Title VI was passed, poverty and minority status were deemed so closely correlated as to be almost indistinguishable. Thus actions adversely impacting the poor will almost invariably adversely impact upon minority groups. The fact that the disparate impact is caused by socio-economic differences between the races rather than genetic ones is irrelevant.

159. Tr. 864.

160. PX 288, Table 14; PX 293; PX 294.

161. Tr. 718.

162. PX 297.

163. *See*, discussion *supra*.

per 100,000, while for whites the rate is 56.[164] The minority death rate from cancer (malignant neoplasms) is 157 per 100,000, compared to 129 for whites.[165]

The elderly also, not surprisingly, show a disproportionate need both for WMC's services in general and for some of the services in particular which will be located exclusively at the Southwest site. The elderly comprise only 7% of the general population but that group accounts for 16.6% of WMC's admissions.[166] Moreover, because of the longer length of stay experienced by the elderly,[167] they account for approximately 29% of WMC's patient days.[168] The elderly have a particular need for services relating to cerebral vascular and cardiovascular diseases. For cerebral vascular diseases, the national rate of discharge for those 65 and older is 20 per 1,000 population compared to a rate of 2.9 for all people.[169] The elderly have a disproportionate need for some of the other services that will be located exclusively at the Southwest Division. For example, the elderly represented 23% of the admissions to gastroenterology, 31% of the admissions to thoracic surgery and 36% of the admissions for radiation therapy.[170]

Thus, under Omega, certain services will be moved 9.35 miles farther from the populations that need them most. There is little dispute between the parties on this fact. There is also overwhelming evidence to the effect that by achieving greater consolidation of services, by effecting extensive modernization, and by providing service to the southwestern areas that have heretofore lacked any hospital beds, Plan Omega will achieve an overall improvement of the level of hospital care provided to WMC's service population as a whole.[171] The real issue of fact is whether that overall improvement is being effected at the cost of decreasing the

quality of care for minorities. Plaintiffs so argue. Defendants, on the other hand, contend that because of the way services will be divided between the two locations and because of the availability of the shuttle and emergency transportation, the added 9.35 miles will have only a minimal effect at best and that the other improvements will result in much better care for minorities than exists at present. The Court will now set forth the parties' contentions in greater detail.

III. THE PARTIES' CONTENTIONS

The numerous, disparate, adverse impacts which plaintiffs allege Omega will have upon minorities, the elderly and the handicapped fall into three major categories. One category relates to minority access to health care under Omega. A second category relates to the quality of health care that minorities will receive under Omega. The third relates to the racial identifiability of the Delaware Division under Omega.

Plaintiffs first charge that access to health care for the minority groups under Omega will be inadequate in many respects. They contend that since the various minority groups are concentrated in Wilmington and its northern suburbs and since these groups disproportionately lack access to private transportation, they will disproportionately be forced to rely upon the WMC shuttle to travel to the Southwest Division. Forced reliance upon the shuttle, plaintiffs contend, will be an adverse impact in and of itself. They argue that the shuttle is inadequately planned and cannot operate on the schedule set with the number of vehicles to be used. Second, there are persons who, because of their health or the nature of their treatment at WMC, will not be able to use the shuttle. Third, the shuttle will increase the risk to passengers of contracting

164. PX 288, Table 11; Tr. 716.

165. PX 288, Table 11; Tr. 716–717.

166. PX 4e.

167. PX 414, Table M, revised.

168. PX 84, p. 88.

169. PX 289; Tr. 721–726.

170. PX 4e; Tr. 743–744.

171. Tr. 1943–1945, 2049–2053, 2158, 2208–2209, 2212–2215, 2272–2278, 2325–2328, 2383–2385; DX 6.

a communicable disease. Fourth, some people, especially working people, will not have the extra time to use the shuttle and still connect with other transportation (primarily DART) to get home, or to pick up children from a day-care center, or take care of other responsibilities. Another segment of the population will be deterred by the travel time, and the strangeness of the rural Stanton area, from going to the new hospital. Fifth, the shuttles may not be adequately equipped and staffed to serve the handicapped.

Plaintiffs then argue that these "inadequacies" will translate into medical problems for the shuttle users. First, senior citizens, who are apt to be confused or timid, and who will often need some form of escort service, will be deterred from seeking needed treatment altogether. Cancer patients, plaintiffs claim, will postpone visits for treatment or decrease their number of visits for treatment, thus harming their health. Mothers required to use the high risk clinics will delay initiation of care and increase the number of missed visits. This decreased prenatal care will translate into greater risks for the mother and a greater likelihood of death or poor health for the infant. Plaintiffs also argue that there will be a decreased number of visitors and that because of the great importance of visitors to the care and recovery of the elderly, young children and post-partum mothers, the health of those groups will suffer.

Plaintiffs also contend that special problems will arise for Hispanics who rely upon community workers, friends or family for translating services. Claiming that WMC now inadequately provides for those who speak only Spanish, plaintiffs contend that Omega will accentuate the problem, both by making it less likely that outside translators will be able to accompany patients to the more distant hospital and by assuring that fewer WMC bilingual workers will be located at Stanton.

Finally plaintiffs focus upon certain travel related impacts which will affect both those who use the shuttle and those who will not. The time required to reach WMC facilities will be increased disproportionately for the minority groups. This, plaintiffs charge, is itself an adverse impact. The extra time will deter both users of the shuttle and those who drive themselves from seeking care.

Plaintiffs' second category of contentions centers around their general contention that the quality of care offered at the Delaware Division will be inferior both to that offered at the Southwest Division and to that presently offered at WMC in many respects. This inferiority, they contend, will be experienced disproportionately by minorities, the elderly, and the handicapped because of a disproportionately high use of the Delaware Division by those groups.

In this regard, plaintiffs first argue that the quality of inpatient care offered at the Delaware Division in the General Medical, General Surgical and Cardiology Services will be inferior to that offered in those services at the Southwest Division. They contend that the physician staff will be inadequate. The Southwest Division will act as a magnet for physicians in New Castle County according to plaintiffs' predictions. Doctors will locate their offices near Stanton and will tend to practice exclusively at the "newer, more sophisticated" facility. This will be especially so for certain subspecialists. As a result, these subspecialists will not be available for consultations or for treatment when complications arise in procedures being performed at the Delaware Division. Most private attending physicians, who will be primarily located at Stanton, will tend to come late and to leave early from the Delaware Division, thus decreasing both the quality of teaching the resident staff will receive and the quality of care at the Delaware Division. Finally, plaintiffs contend that any shortages in medical personnel will be experienced primarily by the Delaware Division because most doctors will prefer the Southwest Division. For example, the present shortage of cardiologists and of surgical residents will result in a shortage of those personnel at the Delaware Division with a consequent decline in the quality of care.

Plaintiffs also contend that the Delaware Division will be physically inferior to the

Southwest Division. They maintain that renovation of the Delaware Division has not been adequately planned and that WMC will never make the Delaware Division capable of delivering a quality of care equal to that which will be delivered at the Southwest Division. They further contend that WMC has not and will not be able to devote the financial resources sufficient to effect the modernization which the Supplemental Agreement requires. Indeed, they argue that Plan Omega is likely to bankrupt WMC altogether.

Thirdly, plaintiffs allege that the quality of clinic care will decline under Omega because of lack of supervision of the residents staffing the clinics, because of the separation of outpatient facilities from inpatient facilities, and because of inevitable understaffing.

Finally, plaintiffs contend that the quality of care that will be offered at the Delaware Division Emergency Room will be inferior. The poor care will primarily be due to the lack of specialists to provide back-up service in cases whose difficulties exceed the capabilities of the jack-of-all trades Emergency Medicine physicians. Plaintiffs particularly emphasize the problems that may arise in obstetrics, where problems in diagnosis and treatment beyond the ken of the Emergency Physician are likely to arise and to need such immediate attention that dire consequences could ensue before a trained obstetrician could be called from his or her office, his or her home, or the Southwest Division and travel to the Delaware Division. Similar problems could allegedly arise if emergencies arose in any area of medical specialty which will be located exclusively at Stanton.

Plaintiffs' final broad category of contention regarding impacts is that under the proposed assignment plan, the Delaware Division will become racially identifiable,[172] having a minority inpatient presence greater than 25%. Thus, plaintiffs argue, the Delaware Division will become a classic "ghetto hospital"—populated by minorities, understaffed with inferior doctors, and housed in inadequate, deteriorated and overcrowded facilities. Omega, plaintiffs conclude, is just the first step in WMC's total abandonment of the city.

In addition, plaintiffs claim that WMC has adopted this discriminatory plan for no good reason. They insist that WMC has failed to articulate any overriding necessity for Omega and that the reasons proffered by WMC for the adoption of the plan are either specious or unfounded in fact. Moreover, plaintiffs argue, many less discriminatory plans exist which could achieve WMC's objectives more effectively than Omega will. Specifically, they contend that a plan consisting of an 800 bed Delaware Division and a 200 bed Southwest Division ("Reverse Omega") would be far superior to Plan Omega and would lack Omega's discriminatory effects.

Finally, plaintiffs contend that WMC intended to discriminate against the plaintiff classes in the planning and design of Omega.

WMC, naturally, disagrees with the plaintiffs on all these points. WMC contends that all health care will be immensely improved under Omega, that the Delaware Division and the Southwest Division will deliver an equally high quality of care, and neither will be racially identifiable.

WMC also contends that of the almost fifty different plans or variations of plans studied by WMC in its decade-long planning process,[173] Omega was the only one which could possibly fulfill the Center's vital needs. Defendants contend that hospital facilities are needed both in the Newark area and the City of Wilmington. Moreover, it is necessary that WMC provide those facilities, because if another entity were to build a hospital in Newark, that new hospital would siphon off paying patients and thereby deprive WMC of needed revenues. The loss of such revenues, WMC

---

**172.** Although plaintiffs argue their racial identifiability point in the section of their brief dealing with discriminatory intent, racial identifiability can be itself a discriminatory impact as well as evidence of intent to discriminate. Indeed, segregation is discrimination in its most classic form.

**173.** Tr. 1580–1606; DX 7.

contends, would result in dramatic fee increases and would perhaps curtail the hospital's ability to offer free care. WMC also contends that some new building is necessary; changing government codes and the deterioration of its present facilities has made extensive renovations necessary. If such renovations are not made, the deteriorated state of the buildings puts WMC at risk of losing its accreditation with the consequent possible loss of Medicare and Medicaid qualification as well as the destruction of its residency program. Finally, WMC contends that greater consolidation of physical facilities is needed both to improve the quality of its hospital care and to improve its residency program. While a complex under one roof would best achieve this goal, WMC contends that a 780-250 bed split is the closest to that ideal that can be achieved if WMC's other goal of providing beds both in the city and in the southwest is to be met.

Omega is the only plan, WMC claims, that is within its financial means and that can achieve the triple goal of modernization, consolidation and provision of beds both in the city and in the southwest. Plans which would locate the bulk of beds in the city, WMC argues, would be so costly as to be beyond its financial resources.

Finally, WMC contends that it did not intend to discriminate and that such discriminatory intent is necessary to state a cause of action under the statutes upon which plaintiffs rely. The Court will first address this last contention in its discussion of the proper standard of review.

## IV. THE APPROPRIATE LEGAL STANDARDS

### A. The *Prima Facie* Case: Impact Or Intent

Title VI broadly proscribes racial discrimination in any program receiving Federal funds. It provides:

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 2000d. Section 504 and Section 6102 employ practically identical language to extend, with certain exceptions, the type of protection afforded racial minorities by Title VI to the handicapped and to the elderly.[174] Section 504 provides:

No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794. Section 6102 provides:

Pursuant to regulations prescribed under section 6103 of this title, and except as provided by section 6103(b) and section 6103(c) of this title, no person in the United States shall, on the basis of age, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

42 U.S.C. § 6102.

WMC contends that under these statutes, as under the Fourteenth Amendment,[175] a *prima facie* case of discrimination can be made out only upon a showing that the challenged action has a disparate, adverse impact upon minorities and that the actor intended to discriminate. Plaintiffs, on the

---

174. Both, in fact, were expressly modeled on Title VI. *See,* 4 U.S.Code Cong. & Admin. News 1974 at pp. 6390–6391 and Conference Report, Older Americans Amendments of 1975, 94th Cong., 1st Sess., Report No. 94–670 (Nov. 17, 1975). Any relevant differences will be discussed, *infra.*

175. *Village of Arlington Heights v. Metropolitan Housing Development,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). *See, generally,* Eisenberg, Theodore, Disproportionate Impact and Illicit

other hand, contend that, as under Title VII,[176] 42 U.S.C. § 2000e *et seq.*, and Title VIII,[177] 42 U.S.C. § 3601 *et seq.*, a showing of disparate adverse impact alone should establish a *prima facie* case. Plaintiffs point out that Federal agencies which have published implementing regulations under

the Acts have all found that disparate impact alone will establish a *prima facie* violation.[178] Plaintiffs also rely upon numerous federal court opinions holding that disparate racial impact alone will establish a *prima facie* violation of Title VI.[179] WMC, on the other hand, points to Supreme Court

Motive: Theories of Constitutional Adjudication, 52 N.Y.U.L.Rev. 36 (1977).

**176.** *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

**177.** *Resident Advisory Board v. Rizzo*, 564 F.2d 126 (C.A.3, 1977), *cert. denied, Whitman Area Improv. Council v. Resident Advisory Board*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978).

**178.** HEW's regulations implementing Title VI generally prohibit actions with a discriminatory effect and specifically prohibit site location decisions having a discriminatory effect. No intent is required. 45 C.F.R. § 80.3(b)(1) specifies that recipients of federal funds may not:
(i) deny an individual any service, financial aid, or other benefit provided under the program;
(ii) provide any service . . . or other benefit to an individual which is different, or as provided in a different manner, from that provided to others under the program;
(iii) subject an individual to segregation or separate treatment in any matter related to his receipt of any service . . . or other benefit under the program;
(iv) restrict the individual in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service . . . or other benefit under the program.
45 C.F.R. § 80.3(b)(2) provides:
(2) A recipient, in determining the types of services . . . or facilities which will be provided under any such program . . . or the situations in which, such services . . . or facilities will be provided under any such program, or the class of individuals to be afforded an opportunity to participate in any such program, may not . . . utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeat-
ing or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.
45 C.F.R. § 80.3(b)(3) provides:
(3) In determining the site or location of a facility, an applicant or recipient may not make selections with the effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any programs to which this regulation applies, on the ground of race, color, or national origin; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the Act or this regulation.
On July 5, 1973, every federal agency published amendments to their regulations, in part, to ensure that each agency had a provision similar to 45 C.F.R. § 80.3(b)(3), prohibiting site location decisions having disparate impacts upon minorities.
HEW's implementing regulations for Section 504 also apply a disparate impact standard. *See*, 45 C.F.R. § 84.4. These regulations apply specifically to site location decisions. *See*, 45 C.F.R. § 84.4(b)(5).
While HEW's Section 6102 regulations are not quite as explicit, they clearly apply to actions taken without discriminatory intent. *See*, 45 C.F.R. § 90.15 and comments appearing at 55 Fed.Reg. 33782 (June 12, 1979).

**179.** *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *New York City Board of Ed. v. Califano*, 584 F.2d 576 (C.A.2, 1978), *affirmed on other grounds sub nom. Board of Education of New York City v. Harris,* 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979); *Guadalupe Org. Inc. v. Tempe Elementary School No. 3*, 587 F.2d 1022 (C.A.9, 1978); *Larry P. v. Riles*, 48 U.S.L.W. 2298 (N.D.Cal. 1979); *Jackson v. Conway*, 476 F.Supp. 896 (E.D.Mo.1979); *Johnson v. City of Arcadia*, 450 F.Supp. 1363 (M.D.Fla.1978); *Lora v. Bd. of Ed. of City of New York*, 456 F.Supp. 1211 (E.D.N.Y.1978); *Soria v. Oxnard School District Board of Trustees*, 386 F.Supp. 539 (C.D.Cal.1974); *contra Otero v. Mesa County Valley School District*, 470 F.Supp. 326 (D. Colo.1979).

*dicta* which, it claims, indicate that the standard required to establish discrimination under Title VI is the same as the standard under the Fourteenth Amendment.[180]

180. *Regents of the University of California v. Bakke,* 438 U.S. 265, 284–287, 325–355, 98 S.Ct. 2733, 2745–2747, 2766–2771, 57 L.Ed.2d 750 (1977) (Concurring Opinion of Powell, J. and Dissenting Opinion of Brennan, White, Marshall, and Blackmun, JJ.); *Board of Ed. of New York v. Harris,* 444 U.S. 130, 100 S.Ct. 363, 375, 62 L.Ed.2d 275 (1979) (Dissenting Opinion of Stewart, Powell, and Rehnquist, JJ.). The majority in *Harris* expressly reserved the question of whether Title VI employs an impact standard. Even the dissent in *Harris* does not unambiguously reject the impact test. While they would have had the court hold that the notion of discrimination embodied in Title VI and all parallel statutes is the same as that embodied in the Fourteenth Amendment, and hence requires a showing of intent, they also intimated that intent may be determined by use of an impact test. They suggested that the Title VII test, the original impact test, is merely a "procedural mechanism . . . designed to provide a means of inferring an employer's motive in the absence of direct evidence." 100 S.Ct. at 381, n. 10. *See,* Perry, Michael, "The Disproportionate Impact Theory of Racial Discrimination," 125 U.Penn.L.Rev. 540 (1977).

181. In finding that WMC had no intent to discriminate, the Court has been guided by the discussion of that issue in *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 141–145 (C.A.3, 1977), *cert. denied, Whitman Area Improv. Council v. Resident Advisory Board,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). In *Rizzo,* the circuit court enumerated several factors that should be considered in making a determination of whether or not a given action was taken with an "invidious discriminatory purpose." In addition to any direct evidence of intent, the reviewing court should consider:
(1) discriminatory impact;
(2) the historical background of the attacked decision;
(3) the "sequence of events leading up to the challenged decision";
(4) departures from "normal procedural sequences"; and
(5) departures from normal substantive criteria.
*Id.* at 143.
Having carefully considered these factors and having carefully examined the record, the Court is convinced that the evidence is overwhelming that WMC not only lacked an intent to discriminate but was actually motivated by concern for the welfare of its urban and minority patients during the planning of Omega.

The Court finds it unnecessary to resolve this issue. The outcome of this litigation will be the same whichever standard is applied. The Court has found absolutely no evidence of discriminatory purpose.[181]

First, the record is utterly devoid of any direct evidence of discrimination. While plaintiffs point to a few isolated statements made in the course of the ten-year planning effort, the Court finds that those statements fail to show any discriminatory purpose. To the contrary, one such statement shows that WMC was aware of the necessity for planning for the special health care needs of the inner city poor. (*See,* PX 31h, pp. 3–4). Others, when read in context, fail to show any intent to discriminate. (*See,* PX 33e, p. 4).

Secondly, the Court has found that Omega as amended by the Supplemental Agreement will have minimal discriminatory impacts at best. The discriminatory impacts of Omega without the Supplemental Agreement might have been greater. HEW found that without the Agreement, WMC would have been in violation of Title VI. However, any inference of intent to discriminate that may be raised by this fact is dissipated by the fact that WMC quickly and voluntarily entered into a burdensome contract of assurances that HEW found would eliminate any discriminatory effects.

The historical background of the decision to implement Omega also fails to show any intent to discriminate. WMC engaged in a ten-year planning process in which it investigated almost 50 different plans or variations thereof. (Tr. 1580–1606; DX 7). Many of those plans were developed and analyzed at high cost by professional hospital planning consultants. (Tr. 1380–1384). WMC's Board of Directors, in making its decisions, paid careful attention to the conclusions of these experts, as well as the recommendations of WMC's Medical-Dental staff and WMC's administration. (*See, generally,* testimony of Joseph Dallas, Tr. 1371–1384, and testimony of John Fulenwider, Tr. 1550–1574). The plans actually studied included plans placing the bulk of beds in the city, plans placing the bulk of beds in the suburbs, and plans dividing beds evenly between the city and the suburbs. The number of plans in each of the three categories is roughly equal. (*See,* DX 7). Moreover, at one time or another, the administration advocated the implementation of at least one plan falling into each category. Health care planning expert Richard James Coffey, after examining the history of WMC's planning effort, concluded that that effort was identical to his own model of a perfect, rational hospital planning process in all respects but three. He found it departed from his model in that: (1) WMC put an artificial constraint upon itself by committing itself to the maintenance

Therefore, if the intent standard applies, the plaintiffs have failed to make out a *prima facie* case and WMC must prevail. On the other hand, as indicated in the discussion to follow, the Court has also found that if the case is decided under the disparate impact standard, WMC must also prevail. Therefore, the Court will now apply the standard most favorable to the plaintiffs—the impact standard to the facts of this case.

### B. The Elements Of The Impact Test

■ Having determined that it will apply an impact test, the Court will now consider the elements of that test. The impact test is, in general, characterized by a shifting burden of proof. The plaintiff bears the burden of proving discriminatory effect. If it meets this burden, the burden shifts to the defendant to "prove" or to "articulate" a non-discriminatory justification for the challenged actions. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1977); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 280 (1973) (Title VII); *Resident Advisory Bd. v. Rizzo, supra* (Title VIII); *New York City Board of Ed. v. Califano, supra*; *Lora v. Board of Education of City of New York, supra*; and *Larry P. v. Riles, supra* (Title VI). *See*, Perry, Michael, *op. cit.* This general formulation obviously fails to specify either the nature of the evidentiary burdens imposed upon the parties or the types of justifications which will be recognized. The Court turns to a consideration of these two questions *seriatim*.

Courts which have applied this shifting burden of proof have, for the most part,

---

of at least one facility in the city; (2) WMC failed to evaluate all alternatives at the same time; and (3) WMC engaged in an overly long planning process. (Tr. 1994–2011). One of the deviations from the *ideal* planning process mentioned by Dr. Coffey was, in part, the result of WMC's concern for continuing to provide service in the city for the city's minority populations. The other two factors do not show an intent to discriminate. The length of the planning process is explained both by changes in demographic projections which necessitated changes in WMC's planning goals (Tr. 1411, 1565–1566) and by the fact that WMC deemed it necessary to give in-depth consideration to a plan proposed by the City of Wilmington which would have located the bulk of WMC's facilities in the city. (Tr. 1380–1382). The failure to compare all plans at one time is explainable in light of the fact that most other plans had been considered exhaustively over a number of years at great cost and had been rejected at the time of investigation as impractical. The reasons for rejection seemed to the Board members to apply still at the time Omega was presented. (Tr. 1449, 1504, 2486, 2034). Plaintiffs appear to argue that WMC's awareness and consideration of the demographic characteristics of New Castle County indicates racially motivated decision-making. All witnesses, both those of the plaintiffs and those of the defendant, agreed that it is essential to consider demographic characteristics—especially the location of minority populations—in hospital planning. (*See, e. g.*, Plaintiffs' Post Trial Opening Brief, D.I. 408, p. 193). Thus, the history of WMC's planning effort gives absolutely no indication of an intent to discriminate.

Examination of the "sequence of events leading up to the challenged decisions" and any possible "departures from 'normal procedural sequences'" fails to show any intent to discriminate. Upon examining the procedures employed by WMC, Dr. Coffey found them normal with the three exceptions noted earlier. (Tr. 1994–2011). The Court has found that these exceptions were due to factors unrelated to discrimination. The plaintiffs have made much of the fact that Omega itself was developed in approximately a month's time. The Court does not find this unusual in light of the explanation given by Oliver Deehan, WMC's in-house planner. The plan was developed as a result of an intense effort, carried out in conjunction with outside expert architects, and was built upon the data developed by the many earlier plans. (Tr. 1709–1714, 1803–1804). Thus, these two criteria reveal no intent to discriminate.

The final criteria mentioned in *Rizzo* is "departures from normal substantive criteria." This factor is similar to defendant's burden of proof in an impact test—need for the discriminatory plan and unavailability of less discriminatory alternatives. This Court has found *infra* that Omega is a response to legitimate health care objectives and that no alternatives other than Omega have been demonstrated which could meet those objectives. Thus, the Court has found no significant departures from normal substantive criteria.

Overall, the Court finds the evidence of lack of discriminatory intent or purpose overwhelming. While plaintiffs have addressed other pieces of evidence which, they contend, point to discriminatory intent, the Court finds their contentions without merit.

failed to distinguish whether they were referring to the burden of going forward with evidence or the burden of persuasion. This imprecision is by no means unique to this area of the law. *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1200 (C.A.3, 1978). A recent line of cases under Title VII, however, has served to clarify the issue. *Furnco Construction Corp. v. Waters, supra; Board of Trustees v. Sweeney*, 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978); *Kunda v. Muhlenberg College*, 621 F.2d 532 (C.A.3, 1980). It is clear from these cases that it is the burden of going forward with evidence which shifts, while the burden of persuasion remains, throughout, with the plaintiff. Thus, the plaintiff first has both the burden of adducing evidence of a discriminatory impact and the burden of persuasion on the issue of discriminatory impact. If the issue of discriminatory impact. If the plaintiff meets both of these burdens, the burden shifts to the defendant to go forward with evidence showing that he took the challenged action for a non-discriminatory reason. If he meets that burden and can produce some evidence showing a non-discriminatory reason for the action, the burden of going forward shifts back to the plaintiff who must then adduce evidence showing that the reason is a pretext. At all times, the burden of persuasion remains with the plaintiff. *See, Board of Trustees v. Sweeney, supra*, 439 U.S. at 28–29, 99 S.Ct. at 297–298.[182]

■ The nature of the justification that will serve to rebut a *prima facie* case of discrimination varies according to the civil rights act which is invoked. These variances reflect differences in the nature of the entities which are subject to the provisions of the various acts, differences in the groups that are protected, and differences in the nature of the discrimination. Thus,

under the Fourteenth Amendment, intentional discrimination, a particularly invidious type of discrimination, may be rebutted only upon a showing of "compelling interest." Under Title VII, controlling employment, the defendant must show a "business necessity." Finally, in Title VIII, an act dealing with housing, where the interests of the defendants in a particular choice tend to be more diffuse and less quantifiable, the defendant must show a "legitimate *bona fide* interest" which can be served by no less discriminatory alternative. *Resident Advisory Board v. Rizzo, supra* at 148–149. Because the nature of the justification that will serve to rebut a *prima facie* case of discrimination varies among the civil rights acts, the Court will now consider each of the acts invoked in this case separately with a view to determining the nature of justification appropriate to each act.

**1. Justification of discriminatory impacts under Title VI**

■ Upon consideration, the Court has concluded that, because of the similarities of a housing location decision and a hospital site determination, it should be guided by the rough criteria set out by the Third Circuit in *Resident Advisory Board v. Rizzo, supra*.[183] The interests affected by both types of decision are nebulous and not subject to quantification. Moreover, as is the case with any decision in the context of "social engineering," numerous interests will be served and disserved and secondary and tertiary effects will abound. Therefore, as in Title VIII, the Court holds that in order to rebut a *prima facie* case under Title VI, WMC must go forward with evidence that Omega will "in theory and practice" serve "a legitimate bona fide interest of [WMC] . . ., and [WMC] must

---

**182.** In the foregoing discussion the Court has adopted the reasoning found in the dissent in *Sweeney*. A close reading of the case reveals that the dissenters and the majority were in agreement that the shifting burden was the burden of going forward. The difference between the two groups lay only in their interpretations of the language used by the lower court. This interpretation of *Sweeney* was apparently

adopted by the Third Circuit in *Kunda v. Muhlenberg College, supra.*

**183.** Title VI, itself, could be applied to a wide range of entities and to an equally diverse range of decisions. For that reason, the nature of the justification required might vary in other cases.

show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Id.* at 149. The requirement that defendants adduce some evidence showing that less discriminatory alternatives would not adequately serve their interests is particularly important in Title VIII cases and Title VI cases dealing with site decisions. Such a decision almost always involves choices among many alternatives and will often serve many legitimate interests.[184] Therefore, a mere showing that a given choice could be supported by non-discriminatory interests without a showing that those interests led to the rejection of alternative sites that may have been less discriminatory would do little to rebut the inference of discrimination raised by the showing of discriminatory impact.

As in Title VIII, the nature of the interests which a defendant may assert will vary. In the present case, WMC has asserted reasons relating to financial necessity, to its ability to maintain a quality medical program and to its ability to deliver efficient, high quality medical care. Given the nature of WMC, these are legitimate interests. Other interests might be asserted by a difference type of institution.

Because the plaintiff at all times retains the burden of persuasion, once the defendant produces some evidence showing that other alternatives would not adequately meet its needs, the plaintiff must rebut this by proving that the needs asserted are only pretexts or that some less discriminatory alternative would meet those needs as well or better than the challenged action.[185]

### 2. Justification of discriminatory impacts under Section 6102

■ The Age Discrimination Act differs somewhat from the other civil rights statutes in that the Age Discrimination Act itself specifies certain categories of age discrimination which will be considered permissible. These standards for justification are found at § 6103(b) and (c) of that Act. Only § 6103(b)(1)(B) is relevant to the present litigation. That provision reads:

(b)(1) It shall not be a violation of any provision of this chapter, or of any regulation issued under this chapter, for any person to take any action otherwise prohibited by the provisions of section 6102 of this title, if in the program or activity involved—

\* \* \* \* \* \*

(B) the differentiation made by such action is based upon reasonable factors other than age.

HEW regulations flesh out this exception further. 45 C.F.R. § 90.15 provides:

A recipient is permitted to take an action otherwise prohibited by section 90.12 which is based on a factor other than age, even though that action may have a disproportionate effect on persons of different ages. An action may be based on a factor other than age only if the factor bears a direct and substantial relationship to the normal operation of the program or activity or to the achievement of a statutory objective.

Normal operation is elsewhere defined:

"Normal operation" means the operation of a program or activity without significant changes that would impair its ability to meet its objectives.

Finally, the regulations explicitly impose the burden of proving that a given action falls within an exception upon the defendant.[186] Although the regulations contain no indication whether they are referring to the burden of persuasion or the burden of going forward with evidence, the Court finds that in a private cause of action, such as asserted here, under the Age Discrimination Act, the

---

**184.** For example, WMC selected Omega from among the almost fifty alternatives with which it was presented.

**185.** The availability of feasible alternatives is itself, of course, a means of showing that the asserted needs are only pretexts.

**186.** "The burden of proving that an age distinction or other action falls within the exceptions outlined in sections 90.14 and 90.15 is on the recipient of Federal financial assistance." 45 C.F.R. § 90.16.

defendant has only the burden of going forward.

■ The Court will be guided by the criteria set out in the HEW regulations. Great deference should be afforded the interpretation given to a statute by the officers or agency charged with its administration and that interpretation should be followed unless unreasonable. *Ford Motor Credit Co. v. Milhollin*, —— U.S. ——, ——, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

■ It should be noted that the Age Discrimination Act and the HEW regulations promulgated thereunder contain no requirement that the least discriminatory alternative be adopted. Of course, the presence of less discriminatory alternatives that would better meet the non-age-related objective is relevant to the question of whether the discriminatory action was actually taken to accomplish that objective. However, where the defendant actually adduces some evidence showing that he based his action upon a non-age-related factor that meets the criteria set out in the act and the regulations, he need not also adduce evidence showing that his action was the least discriminatory alternative. This interpretation is in accord with the Congressional intent to apply a lesser degree of scrutiny to actions resulting in age discrimination than to those resulting in racial discrimination. Congress intended only to prohibit "*unreasonable* age discrimination." Conference Report, Older Americans Amendments of 1975, Report No. 94–670, House of Representatives, 94th Congress, 1st Sess. (1975), at p. 56.[187]

3. *The disparate impact test for Section 504*

Although Section 504 was patterned after and is almost identical to Title VI, important differences between the two acts warrant a full discussion of both the *prima facie* portion and the justification portion of the impact test under Section 504. These differences reflect the differences between the type of discrimination suffered by the handicapped and minorities. While racial discrimination tends to be invidious, the handicapped are wont to suffer from benign neglect. Thus Section 504 was enacted both to eliminate invidious discrimination and increase access for the handicapped. Congress expressly directed that "Where applicable, Section 504 is intended to include a requirement of affirmative action as well as a prohibition against discrimination." Conference Report, 4 U.S.Code Cong. & Admin.News '74, at pp. 6390–6391. Of course, in some cases, Title VI will impose affirmative obligations of some kind. *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). However, the affirmative component of Section 504 is much stronger, both because of the intent of Congress in enacting the section and because of the different nature of the discrimination suffered by the handicapped. Federal courts applying Section 504 have recognized the strong affirmative action component, noting that failure of recipients of federal funds to make "special efforts" or to take "affirmative action" to plan for the needs of the handicapped would constitute a violation of the requirements of Section 504. *Lloyd v. Regional Transportation Authority,* 548 F.2d 1277 (C.A.7, 1977); *United Handicapped Federation v. Andre,* 558 F.2d 413 (C.A.8, 1977); *Leary v. Crapsey,* 566 F.2d 863 (C.A.2, 1977); *Atlantis Community, Inc. v. Adams,* 453 F.Supp. 825 (D.Colo. 1978); *Bartels v. Biernat,* 427 F.Supp. 226 (S.D.Wis.1977). This strong affirmative action component of Section 504 alters the nature of the test which must be applied, both in the impact stage and the justification stage of the test.

■ Thus, Section 504 requires that recipients of federal funds take affirmative action to make their programs equally accessible to the handicapped as well as forbidding them from taking actions which will have a disparate adverse effect upon

---

**187.** *See also*, HEW responses to comments on its regulations, 44 Fed.Reg. 33782–33783 (June 12, 1979).

the handicapped. Failure to comply with either requirement constitutes a *prima facie* violation of Section 504. HEW regulations implementing Section 504 incorporate both types of requirement. Among the relevant forms of discrimination which these regulations prohibit are the following:

(1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;

\* \* \* \* \* \*

(4) A recipient may not, directly or through contractual or other arrangements, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons, or (iii) that perpetuate the discrimination of another recipient if both recipients are subject to common administrative control or are agencies of the same State.

(5) In determining the site or location of a facility, an applicant for assistance or a recipient may not make selections (i) that have the effect of excluding handicapped persons from, denying them the benefits of, or otherwise subjecting them to discrimination under any program or activity that receives or benefits from Federal financial assistance or (ii) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the program or activity with respect to handicapped persons.

45 C.F.R. § 84.4. The regulations further make it explicit that the equality of treatment required is not the provision of a service that produces an identical level of achievement but one which affords the handicapped "equal opportunity to obtain the same result [or] to gain the same benefit." 45 C.F.R. § 84.5(b)(2). Thus, in the context of the case at bar, if the handicapped are given access to medical care equal to that afforded the general population, no discrimination will be found.

The Court will not have to address the thorny questions relating to the disposition of a case where a *prima facie* case has been established under Section 504. *See, Atlantis Community, Inc. v. Adams, supra* at 831. The Court has found, *infra*, that, with the assurances required by HEW and with the continued oversight that HEW will perform, the facilities of WMC under Omega will be equally accessible to the handicapped and the non-handicapped.

Having determined the standards under which it will review Plan Omega, the Court will now turn and examine the plan to determine whether or not the alleged discriminatory effects will in fact occur.

## V. THE IMPACTS OF OMEGA UPON MINORITY, HANDICAPPED, AND ELDERLY RESIDENTS OF NEW CASTLE COUNTY

█ Upon consideration of the impacts that Plan Omega will have upon the minority, handicapped and elderly residents of New Castle County, the Court has determined that those impacts are of such minor import that it must conclude that the plaintiffs have failed to make out a *prima facie* case under any of the statutes which they invoke. Specifically, the Court finds that the plaintiffs have wholly failed to show any adverse impact whatsoever upon the handicapped. The Court further finds that Omega may have, at most, *de minimus* adverse impacts upon the elderly. Finally, the Court finds that Omega may have some negative impacts upon the blacks and Hispanics so insignificant as not to make out a *prima facie* case under Title VI. Overall

Omega will effect vast improvements in the quality of care which all minorities will receive along with the general population.

The Court will begin its discussion with an analysis of Omega's effect upon access. It will then analyze Omega's effects upon the quality of care which will be rendered in the various medical specialties, considering inpatient, clinic and emergency care together under each specialty category. Finally, the Court will consider the allegations of linguistic discrimination against Hispanics and the allegations relating to racial identifiability of the Delaware Division.

### A. Effects Of Omega On Accessibility

Many of the adverse impacts projected by the plaintiffs stem from their claim that minority groups will lack adequate access to the Southwest Division. This argument, in turn, is based upon their contentions that the shuttle will be inadequate, and even if it is adequate, that the additional time spent traveling to the Southwest Division will present a barrier to the use of that facility by minorities. In so arguing, plaintiffs rely upon the testimony of transportation expert Dr. Marvin Manheim.[188] The Court will consider plaintiffs' two contentions regarding access separately.[189]

### 1. *The shuttle will adequately meet transportation demand*

Dr. Manheim presented projections showing that, under the minimal requirements imposed by the Supplemental Agreement, demand for the shuttle will far exceed supply and will create prohibitively long waiting periods for passengers. The Court finds this testimony irrelevant. As previously noted, the Supplemental Agreement includes a categorical obligation to "provide adequate transportation for patients, visitors and employees."[190] The conditions projected by Dr. Manheim, of course, would obviously not be adequate transportation, but, if such a deficit in supply should develop, WMC would be obliged to provide such additional transportation as necessary to meet that demand.

The Court further finds that WMC is ready and able to provide such additional transportation. WMC's financial director, James Tyler, testified that, if waiting periods did occur, WMC would provide more buses.[191] If demand warranted it, WMC would provide additional buses equipped to serve the handicapped.[192] Even if the worst case hypothesized by Dr. Manheim were to develop, the additional costs of providing extra transportation would be minimal in comparison to WMC's annual budget, and those costs could be absorbed by WMC with no strain upon the institution's financial resources.[193]

### 2. *Omega will cause a disproportionate increase in travel time required by minority and elderly inpatients and visitors*

Dr. Manheim's analysis of the effects of Omega included a study of the relative changes in travel times for minority inpatients, visitors and employees under Omega.[194] Considering only the groups of WMC users that will be using the Southwest Division, he forecast a disproportionate increase in travel time for minorities and the elder-

---

188. Tr. 164–395.

189. The plaintiffs in their briefs have also asserted that the mere fact that minorities will have to use the shuttle bus will be a burden because it will cause the users to be exposed to contagious diseases. This is unsupported on the record. There is no evidence showing that a person riding the shuttle will face a greater risk of contagion than does a person riding a DART bus to and from the Delaware Division today.

190. PX 2, ¶ 1.

191. Tr. 2631–2632.

192. Tr. 2647.

193. Tr. 2642–2647.

194. Although a separate analysis was not done for the elderly, the impact upon the elderly should mirror the impact upon minorities, since elderly distribution and lack of access to transportation mirrors those characteristics in the minority population.

ly.[195] WMC's expert on data manipulation, Mr. Tyler, presented data showing that there would be no disparate impact if the impact upon *all* WMC users, including both users of the Delaware Division and all of the clinics, were measured rather than simply the impact upon users of the Southwest Division. The real dispute between the parties on this issue, then, is over the measurement of the impact. The Court finds that both positions have some merit and that the truth lies somewhere in-between.

The Court finds that, as WMC has argued, users of both the Delaware Division and the Southwest Division should be considered together for the purpose of determining relative racial impacts.[196] On the other hand, WMC overstates its position because it would indiscriminately add all categories of users together, combining inpatients, visitors, and clinic users. Since the relative use by race of these categories varies dramatically,[197] an impact or lack of impact upon one category could mask the disparate effect upon another category of user. The proper approach would be to measure impact upon each category of WMC user separately.[198] Consequently, the Court has adjusted the figures presented by Mr. Tyler and Dr. Manheim, crediting users of the Delaware Division with a zero time impact but keeping categories of user separate.

So adjusted, the figures forecast that minority inpatients and visitors will suffer a disproportionate increase in the amount of time which they must spend to reach WMC's facilities.

The figures are illustrated in the following tables: [199]

195. PX 239, 240, 243, 245, 246, 248, 249, 250, and 251.

196. The plaintiffs focus only upon those individuals whose position will be changed by Omega because they will have to use hospital beds located at the Southwest Division rather than the city. While in many cases this emphasis might be proper, in this case, it distorts the picture. Omega is, in a large part, a reaction to the reality that major population shifts to the southwest have occurred within the county. Therefore, in order to serve the overall population best, some beds must be located in the suburbs. All parties agree on that point. However, if one measures only those affected by the move, even a relocation of 200 beds, which the plaintiffs advocate, would have a discriminatory impact. In a relocation of 200 beds, conceivably some inner city blacks would have to travel to Stanton. The impact on the small number affected would appear as a disparate impact.

197. Blacks are much more heavily represented among clinic users than they are among inpatients.

198. This should be done for another reason, as well. The effects of increased travel time will be felt differently by the different categories of users. Visitors will be much more likely to be deterred from traveling to a hospital by an increase in travel time than will those seeking medical care. There are similar differences between those who seek primary care at clinics and those referred by a physician to a medical facility or those seeking inpatient care. According to WMC's expert Dr. Thorpe, the patient seeking primary clinical care is more likely to be deterred by increases in travel time. (Tr. 2273–2275, 2293–2294).

The error of lumping all categories of users together is illustrated by the fact that if this approach were adopted when measuring racial identifiability, the Delaware Division would be racially identifiable under Omega even if it had no minority inpatients. (On Table S in DX 25, Mr. Tyler presented the number of daily clinic users broken down by race. If one uses that number and assumes that all 250 beds were filled with whites, one would get a minority presence of 31%. This actually understates the percentage that would be derived, since inpatient occupancy is actually only approximately 85% [Tr. 595] and since Mr. Tyler derived his daily figure incorrectly. He divided the total number of clinic visitors during the 90-day study by 90 rather than by the number of weekdays. Clinics are held only on weekdays.)

199. All tables and figures are taken from DX 25 and restate Table T found therein. The methodology used is the same as that described by Mr. Tyler. Where two numbers are given, this reflects the fact that Dr. Manheim often stated his numbers in ranges to reflect uncertainty. When such ranges are given the lower numbers for one racial group correlate with the lower numbers for the other racial groups. This correlation extends throughout the range of numbers. (Tr. 262–263).

**INPATIENTS**
(in %)

| Change in travel time (in minutes) | White | Black/P.R. | Other | All |
|---|---|---|---|---|
| −5 or less | 32 | 7 | – | 28 |
| 0 | 42/46 | 43/50 | – | 42/47 |
| 10 | 12/17 | 29/43 | – | 15/22 |
| 25 or more | 5/14 | 14/29 | – | 6/16 |
| (cumulative totals) | | | | |
| 0 or less | 74/78 | 50/57 | – | 70/75 |
| 10 or more | 26/22 | 50/43 | – | 30/25 |

**VISITORS**
(in %)

| | White | Black/P.R. | Other | All |
|---|---|---|---|---|
| −5 or less | 41 | 13 | 40 | 37 |
| 0 | 27/32 | 21/25 | 20 | 26/31 |
| 10 | 15/20 | 34/47 | 40 | 18/25 |
| 25 or more | 5/17 | 14/32 | 0 | 7/19 |
| (cumulative totals) | | | | |
| 0 or less | 68/73 | 34/38 | 60 | 63/67 |
| 10 or more | 32/27 | 66/62 | 40 | 37/33 |

**CLINIC PATIENTS**
(in %)

| | White | Black/P.R. | Other | All |
|---|---|---|---|---|
| 0 or less | 100 | 99 | 100 | 99 |
| 10 or more | 0 | 1 | 0 | 1 |

For clinic patients, while minorities will suffer a minimally greater increase in travel time than will whites, the small numbers of patients using the specialty clinics [200] at the Southwest Division make the figures insignificant.

The Court has not considered any possible impacts upon employees. Because none of the federal funds received by WMC are for the purpose of providing employment, Title VI cannot be applied to WMC's employment practices.[201]

**200.** Only two minority clinic users will, on the average, travel to the Southwest Division per day.

**201.** Title VI expressly provides that it shall not apply to employment practices unless the federal funds which a defendant receives are furnished for the purpose of providing employment. 42 U.S.C. § 2000d–3. Plaintiffs have not shown any such funds. Title VI has been construed to apply to employment practices where discrimination in employment affects the programs for which funds have been given.

3. *The increases in travel time and distance that will occur under Omega will deter use of the Southwest Division by minorities and the elderly in a few very limited respects*

While the small increase in travel time which will occur under Omega is itself an adverse impact, that alone would by no means constitute a *prima facie* violation of Section 6102 or Title VI in a case such as the present one, where the primary service being rendered by the defendant is the delivery of health care. However, because of

*Board of Public Instruction of Taylor County, Florida v. Finch*, 414 F.2d 1068 (C.A.5, 1969); *United States v. El Camino Community College Dist.*, 454 F.Supp. 825 (C.D.Cal.1978). No such showing has been made here.

This finding does not in any way diminish WMC's contractual obligation to abide by those portions of the Supplemental Agreement relating to employee assignments, transportation, and hiring. *See, United States v. El Camino Community College Dist., supra.*

the nature of the populations affected, viz., the elderly and minorities, an increase in travel time may possibly translate into some decrease in the use of health care. Plaintiffs adduced testimony that some of the minority population and the elderly may hesitate to go to unfamiliar places outside of their own neighborhoods and, in some cases, may forego care rather than travel to the new place, even in cases where transportation is available.[202] Testimony was also given that extra travel time could also be a burden for the poor for whom this extra time might mean lost wages and could be a burden for the mother with small children.[203] In addition, because the DART buses, upon which many rely for transportation, stop running at 7:00 p. m. in Wilmington, the extra time required to travel to the Southwest could effectively prevent some minority workers from being able to visit that division.[204] Finally, there may be some few who may be too sick or otherwise physically unable to use the shuttle.[205]

The Court finds, however, that with one minor exception, minority and elderly patients will not be deterred from seeking care at WMC's facilities under Omega. Obviously, they will not be deterred from seeking care at any of the services located at the Delaware Division. Any deterrent referred to above will only occur with services located exclusively at the Southwest Division. Moreover, increases in time and distance will usually only deter those seeking primary care and will have no effect upon those who will be inpatients, those who are acutely ill, or those who are referred by their doctor to a facility to receive specialized care.[206] Since only doctor referred specialty clinics, inpatient facilities, and doctor referred specialty outpatient treatment fa-

cilities will be located at the Southwest Division, this deterrent factor should, for the most part, not apply. The one minor exception is specialty OB care located at the Southwest Division. There, the deterrent effect may cause a few minority women to skip some appointments.[207] While some patients may be too sick or otherwise unable to use the shuttle, ambulances, WMC vans or other volunteer services will provide them with transportation.[208]

Visitors may be a somewhat different story. The Court finds that they may be deterred and that there will be a disproportionate decrease in the number of minority and elderly visitors to the Southwest Division under Omega.

Plaintiffs' witnesses testified that the increase in missed prenatal visits and the decrease in visitors are important principally because they will have some impacts upon health care and health in general. These impacts will be discussed in relation to the effects of Omega on different categories of patient care.

4. *Plan Omega will have no adverse impacts upon the handicapped population of New Castle County and will make WMC's facilities more accessible to the handicapped*

The plaintiffs have failed to show that Plan Omega will in any way render the facilities of WMC inaccessible to the handicapped. Rather the evidence indicates that WMC facilities will be more accessible to the handicapped under Omega than they are at present. Plaintiffs have wholly failed to meet their burden under Section 504 of demonstrating that Omega will have any adverse impact whatsoever upon the

202. Tr. 539–540, 865–866, 879–881.

203. Tr. 879–881.

204. Tr. 467–472, 1186–1191.

205. Tr. 546–550, 1192–1196.

206. Tr. 883–884, 2273–2275, 2293–2294.

207. Tr. 882–884. While Dr. Hardy testified that the increase in travel time necessary to reach the specialty OB clinics would also delay the initiation of care, the Court finds otherwise. Care would, in all cases, be initiated at the general OB clinics at the Delaware Division and then, if a woman's condition warranted it, her doctor would refer her to a specialty clinic. Since all general OB clinics will be located at the Delaware Division, there should be no delays in the initiation of care.

208. *See*, Facts, *supra.*

handicapped. The record is remarkable in its lack of evidentiary support for this cause of action.

As noted earlier, plaintiffs have failed to adduce any reliable demographic evidence concerning the handicapped. Notably, no evidence has been adduced showing that the handicapped population is concentrated in areas nearer to the Delaware Division than to the Southwest Division or that a disproportionate number of handicapped people will be forced to rely upon the shuttle.[209] Given this failure the Court has concluded that the handicapped are distributed randomly throughout the population and that their reliance upon public transportation mirrors that of the general population.

Consequently, in most respects, the impact of Omega on the handicapped will be identical to its impact on the population at large. Specifically, the percentage of handicapped at the Delaware Division and the Southwest Division should be the same as the percentage of the general population at each Division. The quality of care received by the handicapped will increase dramatically and to the same degree as the quality of care received by the population as a whole. Finally, because facilities will be located both in the southwest and in the city, the average distance of hospital facilities from the handicapped should decrease, as the average distance will decrease for the general population.

However, while a decrease in distance will usually mean an increase in accessibility for the general population, this is not necessarily so for the handicapped. Handicapped people often require both special means of transportation and special devices or structures to allow them to get into a building and get around inside. A mere decrease in distance will matter little to the handicapped person who depends upon specialized transportation when that specialized transportation cannot carry him to the new location. Similarly, a decrease in distance will not help the individual who cannot enter or move about a building once he or she arrives. It is for this reason that Section 504 contains the affirmative requirement that facilities of institutions receiving federal funds be constructed so as to make them accessible to the handicapped. The Court is convinced that WMC will fulfill its affirmative obligation under the statute to make its facilities accessible in all respects to the handicapped.

The Supplemental Agreement assures that the handicapped person who arrives at a WMC facility will not be confronted with barriers to entry or free movement within the facility. The Delaware Division must be renovated in accordance with Section 504 and the Southwest Division must be similarly constructed. Thus, under Omega WMC facilities will be more accessible in this respect to the handicapped than are WMC's present facilities.

The Court also finds that access to the WMC facilities will not be decreased because of lack of the specialized transportation often required by the handicapped. The only evidence that would indicate otherwise was testimony by a representative of DAST who testified that the implementation of Omega would cause a reduction in the level of services which DAST could render.[210] The Court finds this testimony partially unreliable because it was based upon a misunderstanding of the demographic characteristics of the county. The representative based her conclusion, in part, on the assumption that the relocation of beds to the Southwest would increase DAST's average trip length. The Court has found that WMC facilities will be located, on the average, closer to the handicapped population under Omega than they are at present. Thus, the average trip length will decrease.[211] The witness also based her conclusion on an assumption that the num-

---

209. *See*, the Facts section of this opinion, *supra*.

210. Tr. 530–532.

211. The witness did testify that a majority of DAST trips either originated or ended in Wilmington. This, however, is apparently because so many of the county's businesses and services are located there and not because the handicapped are concentrated in the area. (Tr. 531–532).

ber of DAST's multi-purpose trips would decrease, since the Southwest Division, unlike the Delaware Division, will be located in an area which is not close to other businesses and services. The Court finds that the efficiency of DAST may be somewhat reduced because of this and that the level of services which it could provide may be reduced.

However, the Court is convinced that under Omega there will be no overall decrease in the transportation available to the handicapped and that most probably there will be an increase. The reduction in service experienced by DAST will be more than offset by the new transportation provided by WMC. WMC must provide at least two full sized buses as well as two vans equipped to transport the handicapped.[212] Thus, WMC itself could provide free transportation in the vans on an individualized basis. Moreover, handicapped passengers could be left by DAST at the Delaware Division and from there they could take the WMC shuttle to the Southwest Division. If the latter approach were adopted by DAST there would be no decrease in the number of multi-purpose trips.[213]

The most probable scenario would be that Omega will increase accessibility for the handicapped. For those handicapped people living in the Southwestern portion of the county traveling to the Southwest Division, trip lengths will decrease and demand for DAST services will correspondingly decrease. Furthermore, while the greater distances which must be traveled by those in Wilmington and the Brandywine Hundred will increase the demands upon DAST, as will the decrease in multi-purpose trips, the supply of specialized transportation will increase dramatically as a result of the additions of WMC's transportation fleet.

Thus, given the facts that under Omega the supply of specialized transportation will be greater, WMC facilities will be located closer to a substantial number of handicapped individuals, and WMC facilities will be constructed to make them accessible, this Court concludes that WMC will be more accessible to the handicapped under Omega than it is at present.

B. The Quality Of Care Which Will Be Received By Minorities And The Elderly In The Medical Specialties Of General Medicine, General Surgery And Related Subspecialties Will Be Equal To That Received By The General Population

The Court finds that the plaintiffs' charges, that the elderly and minorities will receive poorer care than the general population in the medical specialties of general medicine and general surgery and related subspecialties under Omega, are unfounded. It concludes that under Omega the quality of care rendered in those specialties will be better than that which is presently afforded by WMC and that the quality received by minorities will be equal to that received by the general population.

Plaintiffs base their charges of inferior care noted above in a large part upon their dual contentions that (1) the quality of care which will be rendered at the Delaware Division will be inferior to that rendered at the Southwest Division and (2) that a disproportionately high percentage of elderly and minority patients will receive the inferior care that will be rendered at the Delaware Division.[214] In support of their contention that a disproportionately high number of minorities and elderly will rely upon the Delaware Division for general medical and general surgical care, the plaintiffs

---

212. See, Facts section of this opinion, supra.

213. Plaintiffs argue that the shuttle will not provide adequate transportation because, contrary to the Supplemental Agreement, WMC may not adequately equip its buses and vans and because the drivers may not be adequately trained. (D.I. 408 at 49–50). The basis for these contentions is pure speculation and the Court does not find them credible. As noted earlier, the Court finds that WMC will abide by the Supplemental Agreement since non-compli-

ance will automatically invoke the same penalties that this Court could now impose.

214. The Supplemental Agreement, of course, requires that minority inpatient utilization of the Delaware Division not exceed 25%. However, since only 13% of New Castle County's population is minority, it is entirely possible that a disproportionately high number of minority inpatients (any number greater than

note that 72% of the minority and elderly populations live in the ZIP codes assigned to the Delaware Division for these services [215] and consequently will rely primarily upon the Delaware Division for such care.[216] Similarly, because a majority of clinic patients are members of minority groups,[217] poorer clinic care (almost all clinic care will be rendered at the Delaware Division) would have a greater effect upon them than upon whites. Finally, plaintiffs point to evidence showing that poorer care at the Delaware Division Emergency Room might also have a disparate impact. The elderly and minorities, whose living quarters are concentrated in areas nearest to the Delaware Division, might use the Emergency Room of the Delaware Division at a disproportionately high rate.[218]

The Court finds, however, that regardless of where the minorities and elderly will receive general medical and general surgical care under Omega, the care which they will receive will be equal to that which will be received by the general population. This will be so because the general medical and surgical care that will be rendered at the Delaware Division under Omega will be entirely equal to that rendered at the Southwest Division and superior to that which is now rendered by WMC.

1. *The physical quality of the Delaware Division will be equal to that of the Southwest Division in ability to provide patient care and in aesthetics and will be superior to the physical quality of WMC's present facilities*

The plaintiffs contend that care provided at the Delaware Division will be inferior to that given at the Southwest Division because the Delaware Division will be an inferior building in that the proposed renovations will be insufficient to make it equal to the Southwest Division and that WMC may not even be able financially to complete the proposed renovations. The Court finds these contentions to be purely speculative and wholly unsupported on the record.

As mentioned earlier, the Supplemental Agreement imposes the categorical obligation that the Delaware Division be renovated regardless of cost and imposes the minimal obligation that $2.8 million be set aside for that renovation. Plaintiffs' expert, Howard Juster, relying upon still fragmentary plans for renovating the Delaware Division and some earlier unrelated studies, constructed an estimate of the cost of renovating the Delaware Division into a facility that would be equal to the Southwest Division. His estimate yielded a project cost of $24,700,000 exclusive of financing charges.[219] Comparing this figure to the $2.8 million set aside under the Supplemental Agreement for renovations, plaintiffs leap to the unsupported conclusion that the Delaware Division is underplanned and that the underestimate of the cost could lead to WMC's failure to complete the renovations.

First, the Court for reasons already stated has found that WMC will abide by the categorical requirements of the Supplemental Agreement and that HEW will enforce that Agreement. Thus, the Court on this basis alone finds that the Delaware Division will be renovated into a facility equal to the

---

13%) could be located at the Delaware Division without that Division being deemed racially identifiable.

**215.** PX 45a, p. 48; *see also*, PX 23a.

**216.** Plaintiffs adduced testimony that this would occur even if the minority presence at the Delaware Division remains below 25%. (Tr. 592).

**217.** PX 52b, ¶ 37(a).

**218.** This has not been established by the testimony. During the day, white suburbanites commute into Wilmington to work. Any emer-

gencies, such as heart attacks, that occur in that population during the day would be treated in the Delaware Division. (Tr. 1458). Plaintiffs' experts based all admission and use projections upon the racial living patterns only. (DX 3, p. 24). Because Emergency Room admissions will depend upon where the emergency occurs and not upon where the patient lives, the Court cannot find that plaintiffs have established that the Delaware Division Emergency Room will be used disproportionately by minorities.

**219.** Tr. 1274–1275.

Southwest Division. However, other evidence has been adduced which independently leads the Court to this same conclusion.

The testimony indicates that WMC's board members have a present intention to renovate the Delaware Division and commit funds beyond those required by the Supplemental Agreement to that task. The Board considers it a business necessity to maintain a first rate unit in the city. A substandard unit, in the board's opinion, would cause the Center to lose essential revenues.[220] Furthermore, many members of WMC's boards and its officers work in office buildings located within the city and have a personal stake in assuring that a first rate facility be located in the city to treat them should some emergency, such as a heart attack, arise while they are at work.[221]

There is also overwhelming objective evidence indicating that WMC intends fully to renovate the Delaware Division. Between 1969 and 1979 WMC committed some $12,-616,500 to renovation projects in the Delaware Division.[222]

In addition, a number of renovations are currently underway. These renovations were identified by Mr. Juster as having a cost of $7,479,823, but they will probably be completed at a "considerably lower" cost.[223] Including the monies set aside under the Supplemental Agreement, the Court finds that WMC has recently committed or will probably soon commit a grand total of over $18 million to the renovation of the Delaware Division. Such a major commitment certainly does not presage an intention to renege on the renovation of that facility.

The Court also finds that WMC will easily be able to produce the funds that will be necessary to complete necessary renovations. If one excludes (1) those renovation costs in Mr. Juster's estimate which need not and will not be completed at the Delaware Division [224] and (2) the renovation

220. Tr. 1384–1385.

221. Tr. 1457–1458.

222. In DX 14, Mr. Deehan, WMC's planner, presented the following list of projects authorized, completed and/or in progress between 1969 and 1979 relating to the Delaware Division. (Any appropriate references to the transcript are noted in parentheses.)

| PROJECT | COST |
| --- | --- |
| Emergency Room Addition | $ 3,500,000 |
| Radiology (including CAT Scanner) | 1,174,000 |
| Coronary Care Unit | 344,000 |
| Blood Bank | 300,000 |
| Lab Equipment (5) | 299,000 |
| Dental Clinic | 225,000 |
| Intensive Care Units | 184,000 |
| Others (18) | 180,000 |
| Specialty Nursing Units | 154,000 |
| Cardiac Cath Lab | 134,000 |
| Ambulatory Care Services | 115,000 |
| On-Call Quarters | 74,000 |
| Minimal Care Unit | 70,000 |
| Family Practice Offices | 60,000 |
| Nuclear Medicine | 56,000 |
| Medical Records File Storage | 51,000 |
| Parking Garage (Tr. 1680) | 2,000,000 |
| Land for Parking Garage (Tr. 1680) | 782,000 |
| Utility Services (Tr. 1597, 1680) | 2,230,000 |
| Boiler Economizers (Tr. 1685) | 226,000 |
| Parking Expansion (Tr. 1685) | 45,500 |
| Roof Repairs (Tr. 1685) | 99,000 |
| Burn Care Room (Tr. 1685) | 89,000 |
| TOTAL | $12,616,500 |

223. Mr. Deehan testified that the following renovations are currently in progress:

| ITEM | JUSTER'S COST (not applying multipliers) |
| --- | --- |
| 1. Sprinklers (Now being worked on and work is almost complete.) (Tr. 1664). | $ 139,301 |
| 2. Dutch Doors and other Miscellaneous Remodeling (Some doors have already been removed and some may yet have to be done. Tr. 1669) | 140,522 |
| 3. STEP 4. General Face Lift (Now being done at a cost considerably lower than that identified by Mr. Juster. Tr. 1670) | 7,200,000 |
| Adjusted by the Court to a | or |
| considerably lower figure | 2,500,000 |
| PROBABLE TOTAL | $2,779,823 |
| JUSTER TOTAL | $7,479,823 |

224. For example, neither the Delaware Division nor the Southwest Division will need or contain a Mosler Telalift. (Tr. 1661, 1825–1832). A materials handling elevator (Tr. 1661, 1833), heavy renovations on spaces which will not be used for anything (Tr. 1657) and sprinklers which would cover the entire hospital are neither planned nor warranted for a 250-bed Delaware Division.

costs for areas which will not be used by patients or directly for patients, such as office spaces,[225] only $4,006,710 of the necessary renovations identified by Mr. Juster will remain incomplete after the Supplemental Agreement funds have been exhausted.[226] These renovations are planned by WMC [227] and are of the type that would normally be met by use of funds from the operating budget.[228] In comparison with projects which WMC has funded out of the operating budget in the past, the cost of the patient care renovations that will have to be performed with non-Supplemental Agreement funds is minor. In any case,

non-operating budget funds, which were identified at trial by WMC's financial director, James Tyler, could easily meet those expenses and leave sufficient money available to meet the costs necessary for the renovation of office spaces.[229]

Plaintiffs contend, that regardless of WMC's good intentions, WMC will be financially unable to complete the renovations of the Delaware Division because Omega's high costs could cause WMC to experience substantial deficits which may be so great as to force WMC to discontinue free care. While the plaintiffs have adduced evidence raising some questions concerning Omega's

---

Plaintiffs contend that sprinklers would be necessary to make the Delaware Division equal to the Southwest Division. Their expert, Mr. Juster, testified at length that sprinklers would not really be necessary and they often did not accomplish what they were supposed to accomplish in any case. Only upon prompting by counsel did Mr. Juster "guess" that sprinklers "might" be necessary to make the Delaware Division equal to the Southwest Division. Given the weakness of his reply when contrasted to his cogent, unprompted earlier discussion and given the fact that sprinklers have been or are being installed in the areas where they are important for safety, the Court concludes that complete sprinklering is not necessary to make the Delaware Division equal to the Southwest Division. (Tr. 1302–1304).

**225.** If office space renovations were not completed and older less desirable offices were used elsewhere in the Center, the only people affected would be the employees who would work in those offices. If there were any translation of poorer working conditions into poorer patient care, that would affect the entire Medical Center and all of its patients without disparity.

**226.** The following items were identified by both Mr. Juster and either WMC's architect, Mr. Velsey, or Mr. Deehan as planned and necessary but not falling into the abovementioned categories. (All information is derived in part from PX 317. If another source is relied upon it is noted.)

| ITEM | COST |
|---|---|
| 1. Clinic expansion and alterations (Tr. 1650–1651) | $1,633,442 |
| 2. Respiratory Out patient Therapy (Tr. 1657) | 56,531 |
| 3. Nuclear Medicine | 142,689 |
| 4. Bed Head Units (Velsey not sure whether necessary. Tr. 1839) | |
| Third Floor | 55,045 |

| ITEM | COST |
|---|---|
| Fourth Floor | 49,050 |
| Fifth Floor | 9,265 |
| 5. Mechanical Systems (Tr. 1664–1665; Tr. 1884) | |
| Plumbing | 249,500 |
| Hood Fire Suppression | 52,937 |
| 6. Medical Equipment (Built-in) (Tr. 1662–1663, 1833, 1852) | 756,250 |
| 7. Laundry Equipment (Tr. 1662, 1833, 1852) | 1,002,001 |
| TOTAL | $4,006,710 |

**227.** *See* references in Footnote 226, *supra.*

**228.** Tr. 1662.

**229.** Tr. 2739–2742. In fact, at least $9 to $10 million in unrestricted funds will be available to pay for renovations outright. That would mean that at least $5 million would be available for any office space renovation even if these unrestricted funds were used exclusively for the renovation of the patient care related spaces. If more money were needed, that could be supplied by the excess depreciation that would be generated by the new Southwest Division in the early years of Omega.

In fact, the Court has found that the total cost of renovating the Delaware Division, exclusive of financing, will be approximately $14 million. If one multiplies the cost of the items which WMC is now completing by the project cost figure of 1.37 used by Mr. Juster (Tr. 3306–3326), one can derive the amount of that total figure represented by projects now underway. That figure is approximately $3.8 million. Thus, only approximately $10.2 million (including the $2.8 million that must be set aside at the beginning of Omega under the Supplemental Agreement) in additional funds will be necessary to complete all renovations. The sources identified by Mr. Tyler could readily meet those needs.

financial feasibility,[230] the Court finds that evidence irrelevant. Rather than attempting to predict the financial consequences of Omega at this point, the Court believes that this question is better left for determination by the commercial market. The market will be able to apply sanctions as swiftly, surely and with greater accuracy as any this Court could apply. First, sanctions could be applied at or near the time that WMC attempts to market the bonds necessary to finance Omega. Before any such bonds could be underwritten and sold, Omega will be subjected to the same type of rigorous financial feasibility study as that advocated by the plaintiffs' expert.[231] The facts which the plaintiffs have produced at trial and any new updated information will be evaluated by financial experts at that time, and the bond sale could proceed only if those experts pronounced the plan financially sound. Secondly, the financial feasibility of Omega also will be subject to scrutiny by a second group before any bonds can be sold—the investors themselves. These investors will be aware of WMC's commitment to renovate the Delaware Division regardless of cost, as well as the other facts which have been adduced at this trial. If they had any doubts concerning Omega's financial feasibility, no bonds could be underwritten and sold and Omega would never become a reality. However, even if the bonds were sold and, contrary to the expectations of the financial world, WMC becomes unable to fund the renovations of the Delaware Division, the sanctions required under Title VI would be applied by HEW in any case—funds would be cut off.

While the plaintiffs' evidence and the seriousness of the possible consequences of error might lead the Court, if it were a member of WMC's administration or board, to take a hard second look at the plan, the Court refuses to construe the civil rights statutes as a license for this Court to act as a financial overseer to those who provide services to minorities. It would especially hesitate to assume that role in a case such as this, where the sanctions available to the Court could be applied by the market place as effectively and certainly with more accuracy.

The Court next finds that when the Delaware Division is renovated its ability to deliver medical care will be equal to that of the Southwest Division and the care will be provided in equally safe and aesthetic surroundings. While Mr. Juster, plaintiffs' expert, testified that the Delaware Division would be oversized, and inefficient, he also testified and that the Southwest Division would be undersized, and inefficient.[232] The plaintiffs adduced no other evidence regarding efficiency and therefore the Court cannot conclude that the renovated Delaware Division will be any less efficient than the Southwest Division. The Court has previously found that WMC will complete all renovations which plaintiffs' expert Mr. Juster believed to be necessary to make the Delaware Division equal to the Southwest Division.[233] The inference from that testimony is that the two divisions will be equal once the renovations are completed. In addition, there is credible evidence that even with less renovation, the two divisions would have an equal ability to deliver care.[234] Certainly both will be fully equipped hospitals with the physical capability to meet any medical or surgical emergency, as the Court noted earlier.[235]

The Court therefore concludes that the physical capabilities of the Delaware Divi-

---

230. For example, plaintiffs presented strong evidence that Mr. Tyler overestimated patient days and hence revenues under Omega. (Tr. 3204–3214; PX 14, Table K).

231. Tr. 2401–2421.

232. Tr. 1334–1337, 3046. His testimony that the Delaware Division would be inferior was apparently based on the assumption that only $2.8 million would be expended for renovations. (Tr. 1260).

233. Of course, the Court has also found that some of the work which Mr. Juster included in his cost estimate will be unnecessary.

234. Tr. 1716–1717.

235. Tr. 2247; see also, Facts, supra.

sion as it will be renovated will be equal to those of the Southwest Division.

2. *The care delivered by board certified physicians in General Medicine and General Surgery will be equal at the Delaware Division and the Southwest Division*

Plaintiffs argue that the quality of medical care which will be delivered at the Delaware Division by board certified physicians in General Medicine and General Surgery will be inferior to that delivered at the Southwest Division. Plaintiffs contend that this will result for two reasons: (1) physicians certified in those subspecialties that will be located exclusively at the Southwest Division will be unavailable for consultation and treatment at the Delaware Division and (2) the Delaware Division will be abandoned even by those physicians certified in those specialties which will be duplicated at the two divisions. Consequently, plaintiffs maintain that this shortage of competent board certified physicians at the Delaware Division will result in adverse impacts on the minorities treated there.

The Court disagrees. The Court finds that under Omega subspecialists in services located exclusively at the Southwest Division will be available for consultation and the treatment of patients at the Delaware Division. Under Omega, as is the case now, WMC regulations will require a subspecialist in each subspecialty area to be "on call" and thus available to both divisions both day and night.[236] Consequently, if an emergency arises in a subspecialty for a patient admitted at the Delaware Division, the subspecialist "on call" could and would respond promptly.[237]

The Court also finds that either a subspecialist on call or some other subspecialist will likely be at a location in or near the city from which he could promptly reach the Delaware Division. While many subspecialists may open new offices in Stanton and primarily practice in the Southwest Division (if their service is located exclusively there), many will likely continue to maintain offices in the city. Physicians presently locate their offices to be convenient to their patients and many now have offices both in Wilmington and Newark despite the lack of hospital facilities in the Southwest.[238] There is no reason to believe that this pattern will be disrupted under Omega. Moreover, since most doctors are on the staffs of the other Wilmington hospitals, it is likely that many subspecialists frequently will be available in the city because of their duties at those hospitals.

Furthermore, it is clear that the various subspecialists will be able to treat patients adequately once they arrive at the Delaware Division. Since the Delaware Division will be a fully equipped hospital, the subspecialists will have all the necessary equipment available.[239] Indeed, the Delaware Division will have a trauma team,[240] which will include subspecialists, such as neurosurgeons,[241] whose services will be located exclusively at the Southwest Division. In order to support such a trauma team, adequate equipment will have to be located at the Delaware Division.[242]

In most cases, of course, patients in need of subspecialty services will be admitted directly to the Southwest Division. In non-

---

**236.** Tr. 2224–2225.

**237.** PX 2, Ex. A, p. 2.

**238.** Tr. 1139, 2197; DX 13.

**239.** Tr. 2214–2215.

**240.** Tr. 2383.

**241.** Tr. 2336–2338.

**242.** Some very specialized equipment relating to diagnosis and treatment may be located ex-

clusively at the Southwest Division. However, most testimony seems to indicate that with the advanced equipment that will be located at the Delaware Division, all foreseeable emergencies and all foreseeable complications could be treated. The testimony relating to inability to provide treatment in the subspecialty areas related primarily to a predicted lack of subspecialists not a lack of equipment. Any discussion of equipment is difficult at this point in time since plans remain fluid.

critical cases, patients can easily be transferred to the Southwest Division by means of WMC's interdivisional ambulances.

Thus, the Court concludes that the quality of care delivered in General Medicine and General Surgery will not be prejudiced in any way by the location of certain subspecialty services exclusively in the Southwest Division.

Plaintiffs' second argument is that the Delaware Division will be understaffed even in those services duplicated at the two divisions because the majority of doctors in those services will elect to practice exclusively at the newer hospital and relocate their private offices close to that hospital. The Court finds these conjectures unfounded in fact.

First, under the Supplemental Agreement, a doctor *cannot* decide to limit his practice to one division, as the plaintiffs contend, unless that doctor either disobeys WMC's policies implementing the Supplemental Agreement or decides to refuse to treat patients from certain ZIP codes assigned to the Delaware Division. The Court finds that doctors in order to enjoy staff privileges at WMC will abide by WMC's procedures implementing the Supplemental Agreement [243] and that they will not choose their patients on the basis of ZIP codes. Consequently, all doctors enjoying WMC staff privileges in duplicated services will have patients who will be admitted to the Delaware Division and those doctors will practice at that division.

The Court also finds independently that the majority of doctors in duplicated services will not elect to practice exclusively in and around the Southwest Division. The services which are duplicated are the general ones which would be provided by any hospital. Hence, doctors on these services will probably have duties at Riverside and St. Francis thus creating less of an incentive to move their practices out of the city as plaintiffs predict. Indeed, given the fact that under Omega the number of hospital beds within the city will approximate the number that are at the Southwest Division and many of the beds in the Southwest will be subspecialty beds, it is not unlikely that there will be more general service beds located in the city (Delaware Division, St. Francis and Riverside) than there will in the suburbs. While the present imbalance of doctors offices in the county [244] will be redressed under Omega and some doctors will move their offices from Wilmington to the Southwest, the Court finds that many doctors will remain in Wilmington, will practice at the Delaware Division, and will continue to be available at that division. The Court finds absolutely no merit to plaintiffs' contention that the doctors of New Castle County will all rush to the Southwest Division.[245]

---

**243.** Tr. 1225–1228, 2245. Of course, if they did not, WMC would be required to take more stringent, perhaps compulsory measures.

**244.** *See*, DX 13.

**245.** This contention is typical of many of the dire predictions which plaintiffs have developed for this case. Starting with a single fact which, in itself, is plausible, plaintiffs build a scenario, on the basis of conjecture, which is wholly implausible. For example, here, the plaintiffs have shown that doctors and patients will tend to prefer a newer, more sophisticated hospital. This is perfectly plausible and supported by credible evidence. However, at this point plaintiffs, and occasionally their experts, depart from reality and develop the incredible forecast of doctors scurrying from the Delaware Division like rats from a sinking ship. Plaintiffs assume that because of the general preference for a new hospital, doctors will flaunt the Supplemental Agreement and neither the WMC administration nor HEW will intervene. Moreover, plaintiffs ignore the pull of other hospitals which will remain in the city and the historical patterns relating to the location of doctors offices.

By repeating this pattern many times, plaintiffs have managed to construct predictions in which the Delaware Division under Omega would be a truly substandard ghetto hospital. However, when subjected to scrutiny, this picture has an extremely limited basis in fact. If the actual facts which plaintiffs have developed are considered alone, their case appears to have very little substance. However, because they have forecast such horrendous consequences, the Court is required to consider each of them with the consequence that even this opinion may give the impression that, overall, minorities will be disadvantaged by Omega. The Court, after careful consideration of the

Because all board certified physicians on WMC's staff in the duplicated specialties will practice at the Delaware Division and maintain offices in Wilmington, there is no basis for plaintiffs' contentions that they will come late to clinics, leave early and skip clinics. Similarly, there is no merit to their contention that residents in the duplicated services will have less supervision by board certified physicians at the Delaware Division than they will at the Southwest Division. In sum, the Court concludes that the services performed by board certified physicians in duplicated services will be equal in the two divisions of WMC under Omega.

### 3. Services rendered by residents will be equal at the two divisions of Omega in duplicated services

Plaintiffs also contend that services rendered by the resident staff in duplicated services will be inferior at the Delaware Division because that division will be understaffed with residents, staffed with residents of poorer quality, and will be less well supervised. The Court finds otherwise.

First, the Court has previously found that the presence of board certified physicians in the Delaware Division at all times will assure that that Division will be as well supervised in duplicated services as will the Southwest Division. Second, the Court finds that plaintiffs have failed to adduce any credible evidence to support their contention that, if there is a shortage of residents, that shortage will be experienced solely by the Delaware Division. In fact, the evidence indicates otherwise. The Supplemental Agreement categorically requires that the residency program be operated on a unified basis. WMC's director of the educational program plans to rotate residents among all the floors of the two divisions under Omega in the same way they are now rotated among the floors of WMC's three

present divisions.[246] There is no indication that rotations in the Delaware Division will be dropped if a shortage should develop. In fact, with new improved facilities, there is less likelihood that there will be a shortage of residents because recruitment will be facilitated.[247] Finally, the requirement of a unified program will assure that the residents of the two divisions will be the same individuals. Indeed, the quality of the residents should improve over the present because the improved program in rejuvenated and newer facilities will attract more qualified residents and will provide them with better training.[248]

### 4. Clinic care and Emergency Room care in duplicated specialties at the Delaware Division will not be adversely affected by Omega

The Court's earlier findings that in general medicine, general surgery and related subspecialties, the Delaware Division will be fully and equally staffed and equipped compel the conclusion that clinic care and Emergency Room care in these specialties will not be adversely affected by Omega.

Undoubtedly, clinic care will greatly improve under Omega. The clinics will have more space and the concentration of clinics will facilitate interdisciplinary consultation.[249] Physicians who are board certified in general medicine and general surgery will always be present at the Delaware Division for consultation. Finally, residents will be less likely to be pulled out of the clinics for other duties if the clinics are concentrated at the Delaware Division.[250] Thus, shortages of physicians at the clinics will occur less frequently under Omega.

The Emergency care in these specialty areas at the Delaware Division will also be equal not only to the present level of care but also to the level of care that will be delivered at the Southwest Division. The

facts and examination of the record as a whole disagrees emphatically.

**246.** Tr. 1935–1941.

**247.** Tr. 1943–1945, 2208–2209.

**248.** Tr. 1943–1945, 2208–2209.

**249.** Tr. 1943–1945.

**250.** Tr. 1974.

same staff will serve the Delaware Division and the Southwest Division. Both divisions will have Class I emergency rooms and will have backup capacity in all required medical specialties. The two emergency rooms will be mirror images.[251] Moreover, in the areas of general medicine and surgery, backup specialists will be located on the premises both for consultation and treatment. Subspecialists would, of course, be on call and available also.

5. *Minority and elderly users of the subspecialties of medicine and surgery which will be located exclusively at the Southwest Division will suffer no significant adverse impact*

The Court also finds, contrary to plaintiffs' contention, that minority and elderly users of the subspecialties of medicine and surgery, that will be located exclusively at the Southwest Division, will suffer no significant adverse impact. The Court has already found that the location of those subspecialties at the Southwest Division will not adversely affect the quality of care rendered in general medicine and surgery at the Delaware Division. The Court has also found that since means of transportation are available and small differences in distances do not affect inpatient utilization, use of these services by minorities and the elderly will not be diminished under Omega.

In fact, the Court concludes that the quality of inpatient care that minorities and the elderly will receive in these specialties will be negatively affected by Omega in only one very minor respect. Visitors may be deterred from going to the Southwest Division. A lack of visitors could have both psychic and physical deleterious effects upon the elderly[252] who have a disproportionately high use of many of these serv-

ices. In all other respects, the quality of inpatient care will be improved.

The Court also finds that no adverse effects upon minorities and the elderly will follow from the exclusive relocation of the outpatient services for these subspecialties. Plaintiffs argue that use of these services by minorities and the elderly will be deferred or even blocked by the increased distance, and point to the testimony of one elderly individual who said that she would have given up in despair had she had to obtain radiation therapy in Stanton. The Court gives this testimony no credence. As mentioned earlier, utilization of services to which one is referred by a doctor, such as those under consideration here, is not reduced by small increases in time or distance. Indeed, plaintiffs' own expert noted that those who are acutely sick are more likely to surmount barriers of distance than those who seek only preventative care.[253] This Court, therefore, simply cannot believe that people will forego treatment for cancer, diagnosis or treatment for a neurological disorder, or care in any of the other subspecialty outpatient services merely because of a twenty-five minute increase in travel to and from the hospital in each direction.[254]

6. *Conclusions*

The Court therefore concludes that the plaintiffs have failed to prove that any adverse effects upon the plaintiff classes will occur under Omega in the specialties relating to medicine and surgery other than a slight negative effect upon the quality of care for the elderly due solely to the fact that they may have fewer visitors when admitted to the Southwest Division.

The Court has, to this point, completed its consideration of all the negative impacts which will affect the elderly[255] and can

**251.** Tr. 2377. *See generally* Tr. 2368–2388.

**252.** Tr. 789–791.

**253.** Tr. 883–884.

**254.** Of course, those unable to use the shuttle or another form of transportation because they are too sick or debilitated from their treatment (such as those who have received some forms

of cancer therapy) could be transported to and/or from their treatment in WMC vans or ambulances.

**255.** The only impacts which the Court has not yet discussed relate to obstetrics, pediatrics, racial identifiability and linguistic discrimination.

therefore conclude that the plaintiffs have failed to establish a *prima facie* case under Section 6102. All that plaintiffs have shown is (1) a slight disparate increase in travel time, (2) a decrease in the ability to visit patients at the Southwest Division and (3) the slight negative effect which the decrease in visitors may have upon the quality of care.[256] These impacts are, at best, *de minimus*.[257]

### C. Plan Omega May Improve Minority Obstetrical Care Somewhat Less Than It Will Improve White Obstetrical Care

While Omega will achieve marked improvements in the quality of obstetrical ("OB") care delivered by WMC, the Court finds that certain characteristics of the plan, enumerated below, may have a slight adverse effect upon minority OB health. Because of these potential negative effects, the quality of OB care and health may not improve as much under Omega for minorities as it will for whites. Any difference in improvement, however, will be so insubstantial that it could not be considered a *prima facie* violation of Title VI.[258]

Plaintiffs contend that minority obstetrical care will be negatively affected because all inpatient OB services and some specialty clinics will be located at the Southwest Division. Specifically, plaintiffs maintain (1) that this configuration will adversely affect the quality of care delivered at the non-specialty OB clinics which will be located at the Delaware Division, (2) that it will adversely affect the quality of emergency obstetrical care delivered at the Delaware Division,

and (3) that it will decrease minority utilization of the high risk (specialty) clinics.

1. *The quality of care which minorities will receive at the general OB clinics and in OB inpatient services will either improve or remain the same under Omega and will be no different from the quality of care received by whites*

The Court finds that the quality of care which WMC will deliver at its OB clinics located in the Delaware Division under Omega will either improve or remain the same. Plaintiffs predict that the quality of care that will be received at these clinics will decline because all board certified obstetricians will be located in the Southwest Division and, consequently, will be unable to provide supervision for the residents who run the OB clinics at the Delaware Division and also will be unavailable for consultations. The Court rejects this contention because it is based upon a misunderstanding of the present situation.

There are now no attending physicians present at OB clinics which are managed entirely by the nursing staff and senior residents.[259] Thus, plaintiffs' projected lack of supervision can have no adverse effect, since it would represent no change from the present state of affairs. Under Omega, as now, if a resident decides that he needs a consultation, he can simply call an attending physician on the telephone.[260] The only adverse effect that Omega could have upon OB clinic care would be due to the possibility that residents may be somewhat less

---

**256.** Of course, this conclusion must be considered in the context of the Court's finding that the overall level of care will increase because of the benefits of greater consolidation, better residents, and improved facilities.

**257.** Even if the Court did find that these impacts made out a *prima facie* case, it would find that WMC had met its burden of showing need.

**258.** HEW regulations provide that Title VI will be violated if actions are taken "which will have the effect of defeating or substantially impairing the accomplishment of the objective of the program as respect [sic] individuals of a

particular race, color, or national origin." 45 C.F.R. § 80.3(b)(2). This would seem to apply to cases where a lesser benefit is conferred on minorities than is conferred on whites. However, a violation could be found only when the benefit is "substantially" less. Indeed, it is almost impossible to imagine an act which would have an absolutely equal effect upon all the different groups into which a society may be divided.

**259.** Tr. 2135–2137.

**260.** Tr. 2156.

inclined to ask a doctor to travel nine miles for a consultation in person and the doctor himself may be less inclined to come.[261] However, because the senior resident who will be on duty there has already completed most of his training, few such consultations will be necessary.

This minor adverse effect will be counterbalanced by many changes which will effect dramatic improvements in OB care. The increase in space and increased interaction with other medical specialties made possible by the consolidation of the clinics will improve care.[262] Furthermore, the tendency to pull residents out of the clinics so that they can help with obstetrical surgery, a problem at the present time, will be eliminated under Omega.[263]

The Court also finds that the quality of OB inpatient care will improve under Omega and that the exclusive relocation of these services to the Southwest Division will, with one minor exception, have no negative effects upon minorities. OB inpatient care will improve for the same reasons inpatient care will improve in other specialties. Modernized facilities, consolidation of medical specialties under one roof, an improved educational program, and better residents [264] will all work to improve care for OB inpatients. This improved care will be completely accessible to minorities because of the availability of state-wide ambulance service and the WMC shuttle. No witness even suggested that an increase in travel time would deter one from seeking inpatient care.

Plan Omega will have only one very minor adverse effect upon minority users of WMC's OB inpatient services. OB inpatients have a great need for visitors.[265] Because Omega will deter some minority visitation, this need will be unfulfilled for a few minority OB inpatients. The Court finds this effect, however, insubstantial.

2. *The relocation of the high risk OB clinics to the Southwest Division may deter some minority use of those clinics and may have a minor effect upon minority health*

Plaintiffs next assert that, since minorities have a disproportionate number of "high risk" pregnancies, they will have a greater need for the so-called "high risk" obstetrical clinics. They contend that the location of these clinics in the Southwest Division will deter minority utilization with the result of an adverse effect on minority health. The Court agrees only to a limited degree. The Court finds that the potentially serious adverse impacts of this relocation will be minimized under Omega. It finds first that because of a misunderstanding of the nature of WMC's high risk clinics, plaintiffs' experts grossly overestimated the number of minority patients who would utilize those clinics. The Court also finds that plaintiffs' experts overestimated the effect of the relocation on those who would use the high risk clinics because the experts were unaware of a number of mitigating factors.

It is true that minority patients will have a greater need for the high risk clinics which will be located at the Southwest Division than will whites. Although only patients with specifically identified medical and obstetrical conditions will be referred to the high risk clinics at the Southwest,[266] minorities may be referred there at a disproportionately high rate because of the high incidence in the minority population of the types of medical and obstetrical conditions that would warrant referral.[267]

261. Tr. 906–907.

262. Tr. 2158.

263. Tr. 1973–1974.

264. Tr. 2052–2053, 2158.

265. Tr. 937–947.

266. Tr. 2141–2144.

267. Tr. 862–864, 867, 894. Among the conditions which would warrant referral to a high risk clinic are hypertension, cardiac disease, diabetes, a prior Caesarian Section, or a history of pre-eclampsia. (Tr. 2142). The Court has already discussed the disproportionate incidence of many of these conditions in minority populations, *supra*.

The Court also finds that minority patients will be somewhat deterred from seeking care at the high risk clinics at the Southwest. Although distance is less likely to deter treatment in cases where a doctor refers the patient for treatment (as will be the case for the high risk clinics at the Southwest), people seeking pre-natal care are more likely to be deterred from seeking medical care than are other classes of patients. This is so because, even in the case of high risk pregnancies, there are often no symptoms which might worry the mother. This would be especially true, for example, in the case of a mother with hypertension.[268] Consequently, some minority users of the specialty OB clinics may skip more appointments at those clinics under Omega and their health and the health of their babies could suffer from this.

However, the Court also finds that the use of the high risk clinics at the Southwest by minorities will be only very slightly greater (proportionately) than use by whites. Plaintiffs and their expert overestimated minority use (and consequently adverse effects) because of a misunderstanding of the nature of WMC's high risk clinics. Plaintiffs' expert testified that pregnant minority teenagers, who are poor users of health care[269] and are statistically more likely to have pregnancies with adverse outcomes,[270] would be especially affected by the location of the high risk clinics at the Southwest and would be more likely to skip visits or delay the initiation of care.[271] The fact is, however, that the special clinics which WMC maintains for teenagers and Hispanics are not called "high risk clinics" and will be located at the Delaware Division under Omega.[272] Thus, the adverse effects of the relocation predicted by plaintiffs' expert for this large group of minority patients will never materialize.

The Court also finds that a number of factors will work to minimize any potentially adverse effect of the relocation of the high risk clinics for the much reduced groups of minority patients who will have to use them under Omega. First, Dr. Slate, WMC's Director of the Department of Obstetrics and Gynecology, testified that if a large number of high risk patients did appear at the Delaware Division, these patients would be identified, grouped in a special high risk clinic located at the Delaware Division, and treated by an attending physician.[273] Of course, even in that case some treatments might have to occur at the Southwest Division because that will be the site where the most sophisticated obstetrical equipment will be found.[274] Second, even if no special high risk clinic were established at the Delaware Division and minority patients were unwilling or unable to travel to the Southwest Division, they could still receive most necessary pre-natal care at the Delaware Division where WMC obstetricians would do "the best we can."[275]

3. *An increase in obstetrical emergencies presenting at the Delaware Division Emergency Room will have a negative effect upon minority obstetrical health in only rare instances, if ever*

Plaintiffs' final prediction regarding the quality of minority OB care that will be delivered under Omega relates to the quality of obstetrical care that will be rendered at the Delaware Division Emergency Room. They first contend that the number of OB problems presenting themselves to the Emergency Room will increase because of the almost total lack of OB inpatient facilities in the city. Secondly, they contend that, because no OB inpatient services will be located in the Delaware Division, the care rendered by the Emergency Room will be inferior.

**268.** Tr. 879–887.

**269.** Tr. 849.

**270.** Tr. 888–893.

**271.** Tr. 879–888.

**272.** Tr. 2133–2137.

**273.** Tr. 2140.

**274.** Tr. 2149.

**275.** Tr. 2150.

The Court finds that the vast majority of women with obstetrical problems will go directly to the Southwest Division or will be taken there by ambulance. There nevertheless will be a few who will go directly to the Delaware Division Emergency Room. This is so because obstetrical problems can have a very rapid onset and in some cases there will simply not be the time to travel nine miles to the Southwest Division.[276]

The Court also finds that the care of women who do arrive at the Delaware Division Emergency Room with OB problems will rarely, if ever, suffer because of the lack of inpatient facilities in the building. There are certain obstetrical problems which no physician other than one trained in obstetrics could diagnose and treat. When such cases arrive at the Delaware Division Emergency Room, an obstetrician should be called in for consultation or treatment, and the lack of any in-house obstetrician in some very rare cases could prejudice the quality of care received.[277] Such problems are very rare and will arise only infrequently in the limited population of OB patients using the Delaware Division Emergency Room. Moreover, in the vast majority, if not all, of those very rare cases, the problems will be adequately treated.

First, a senior obstetrics resident will always be present at the Delaware Division during clinic hours. He or she could be called for consultation and treatment at the Emergency Room if necessary during that time.[278] Because the Emergency Room will be equipped with all the apparati necessary to handle obstetrical emergencies,[279] the obstetrical resident will be able to give definitive treatment for difficult obstetrical emergencies arriving during clinic hours.

At all times, obstetricians can be called for treatment and consultation. The obstetrician "on call" would have the responsibility for such cases assigned to him or her. The only cases then, where care would be in any way prejudiced would be the extremely rare ones where the condition would not be diagnosed as an obstetrical problem by the personnel immediately available to the Emergency Room and ones where an obstetrician could not reach the Delaware Division in time.

Such cases will almost never occur. The staff which will be located in the Delaware Division has the capability of handling most OB problems. Family medicine will be located in the Delaware Division. Family practitioners are skilled at delivering most babies.[280] First year residents in Obstetrics and Gynecology rotate through the Emergency Room and their expertise will often be available.[281] Finally, Emergency Medicine residents themselves get training in OB–GYN and will rotate through that department.[282] Emergency Medicine physicians can diagnose even the rarest of obstetrical emergencies, including ruptured ectopic pregnancies [283] and placentia previa.[284] Furthermore, since emergency physicians specialize in patient stabilization, they could stabilize an OB patient in almost all cases until an obstetrician could arrive to render definitive treatment.[285]

Thus, the Court concludes that the cases in which a minority patient will receive inadequate care at the Delaware Division Emergency Room for an obstetrical emergency will be so rare (assuming that any occur at all) that the effect will be insignificant.

276. Tr. 897–902, 953–959, 973–974. Since OB inpatient services are currently located only blocks away from the site of the Emergency Room, this distance factor does not obtain and obstetrical cases arriving at the Emergency Room are rare indeed. (Tr. 2152).

277. Tr. 678–688, 897–923, 2072.

278. Tr. 2151–2154.

279. Tr. 2154.

280. Tr. 1942.

281. Tr. 2153–2154.

282. Tr. 2153.

283. Tr. 2379–2380.

284. Tr. 2381.

285. Tr. 2380.

### 4. *Conclusions*

While the factors described above may, in some very rare cases, have a negative effect upon the quality of obstetrical care which minorities will receive, these negative effects are only insignificant when compared to the vast improvements in the quality of care that will be gained by Omega. There may be a few minority high risk patients who will miss some appointments at the specialty clinics and in the rarest of cases an obstetrical emergency may arrive at the Delaware Division Emergency Room and receive inadequate treatment. These effects will be so unusual that the Court cannot find that they would establish a *prima facie* case under Title VI, even when considered in conjunction with the other very minor effects which plaintiffs have shown.

### D. The Quality Of Pediatric Care Received By Minorities Will Improve Under Omega And Will Be The Same As That Received By The General Population

The Court finds plaintiffs' forecasts regarding the effects of Omega upon pediatric care to be unfounded in fact. Under Omega, pediatric inpatient services will be almost exclusively located at the Southwest Division. Plaintiffs maintain that this will adversely affect the quality of Emergency Room care and clinic care at the Delaware Division, thus having a disparate impact on minorities. They also assert that the lack of visitors for inpatients and an alleged decrease in flexibility will likewise have an adverse impact upon minorities.[286] The Court finds that the care which minority children will receive under Omega will equal that received by white children in all respects.

First, Omega will have no negative effects upon the quality of care at the pediatrics clinics. The general outpatient clinics will be located in the Delaware Division and will be fully supervised by a board certified pediatrician who will be present for all clinics. This physician is an excellent teacher.[287] To the extent that any specialty outpatient services may be located at the Southwest Division, the Court finds that they will be accessible and utilized for the same reasons it found that outpatient specialty services related to general medicine and surgery which will be located at the Southwest Division would be accessible and utilized.

Secondly, the Court finds that the quality of care received in the Delaware Division Emergency Room will be the same for pediatrics patients as that received in the Southwest Division Emergency Room. A senior pediatrics resident will be stationed at the Delaware Division Emergency Room at all times. He or she will be required to examine any infant less than three months of age coming into the Emergency Room and will always be available for consultation. Thus, someone will always be present who can diagnose and treat the often obscure childhood diseases [288] and this resident will have adequate backup support from board certified pediatricians. One will be present in the Delaware Division from 9:00 a. m. to 5:00 p. m. and numerous board certified pediatricians will be on call who can be consulted during other hours.[289] The Emergency Room will further be supported by two or three pediatrics inpatient holding beds [290] and will be equipped with those devices that may be necessary for diagnosis and treatment in pediatrics, including an intensive care nursery.[291] Even if the child should have to be moved to the Southwest Division, WMC has both the transport equipment and the experience necessary to

---

**286.** Thus, for the most part, the types of effects alleged for pediatric care echo those alleged for obstetrical care.

**287.** Tr. 2313–2314, 2316–2317, 2319.

**288.** Tr. 2315–2318.

**289.** Tr. 2316–2317.

**290.** Tr. 2314.

**291.** Tr. 2321–2322, 2372.

move even critically ill children without adverse consequences.[292]

Thirdly, the Court finds that the location of most pediatric inpatient beds at the Southwest Division will have no negative effects upon minority inpatients. Plaintiffs contend that the decrease in minority visitors will have an adverse effect upon the health of minority pediatrics inpatients. The Court does not agree. Although visits by family members are "extremely important" for sick children,[293] the full benefits of visiting are felt with just a few visitors.[294] WMC has in force policies which will ensure that under Omega no minority child will lack those few visitors. The pediatrics staff strongly encourages parents to stay with their children and requires that they do so for patients under three years of age.[295] Because of that fact, this type of visiting, unlike other types, would be similar to doctor-referred outpatient services and would be relatively undeterred by increases in time and distance. Furthermore, WMC makes special arrangements to enable members of the family to spend the night with the child, thus eliminating any problems that the cessation of bus service at 7:00 p. m. might have.[296] Even in those rare cases where parents would be unable to remain with an infant, WMC provides surrogate parents to provide the atmosphere of love and attention that is essential to the child's well-being and recovery.[297]

Finally, the Court finds that, contrary to plaintiffs' predictions, Omega will not reduce flexibility or deter WMC's ability to deal with pediatric epidemics. The pediatrics department, presently split between two divisions,[298] has thus far had no problems with flexibility during epidemics.[299] Omega, by locating all inpatient services in a single building, should not reduce flexibility, but should increase it.

The pediatrics department will also benefit from all the improvements in care that have been mentioned in relation to the other medical specialties. Under Omega both medical education and the quality of patient care will improve because of the benefits of consolidation.[300] Given this fact, and the fact that no negative effects upon minorities have been shown in pediatrics, the Court concludes that pediatrics care for minorities will improve and will improve as much as care for whites.

### E. Omega Will Have No Other Discriminatory Effects

The Court finds that all of plaintiffs' other contentions relating to discriminatory effects are without merit.

Plaintiffs have claimed that Omega will discriminate linguistically against Hispanics. They charge that WMC presently has inadequate facilities for providing interpreters for Hispanics and that this inadequacy will be exacerbated under Omega because the people from the community who presently serve as interpreters will be unable to take the extra time necessary to accompany patients to Stanton. The Court finds that there is no shortage of WMC personnel capable of acting as interpreters and that no shortage will arise under Omega.

WMC currently maintains a list of all employees who are capable of acting as interpreters. These lists are constantly updated and are periodically made available to all divisions.[301] WMC physicians testified that under these arrangements they had always been able to find a capable interpreter from among the WMC staff.[302]

292. Tr. 2322–2324.

293. Tr. 940–947, 2323–2324.

294. Tr. 2324.

295. Tr. 2352.

296. Tr. 2324, 2352.

297. Tr. 2353–2354.

298. Tr. 2325.

299. Tr. 2319.

300. Tr. 2325.

301. PX 62, pp. 17–18.

302. Tr. 2154, 2219.

Plaintiffs nevertheless maintain that the interpreters provided under this arrangement are often inadequate. They say that, in some cases, no bilingual doctor, resident, medical student, or nurse is available to serve as an interpreter and that a member of WMC's non-medical staff must be relied upon. This, they contend, is inadequate because these persons are untrained in medicine and unfamiliar with technical medical terms. The Court finds this contention unfounded. A number of doctors testified that they had never experienced any difficulties in using non-medically trained personnel to question patients. Since the patients themselves are untrained in medicine and unfamiliar with medical terms, there is no need to have an interpreter who is familiar with those terms.[303] Plaintiffs also maintain that interpreters drawn from the non-medical staff will be inadequate because Hispanic women will be shy in discussing their medical problems in their presence. Testimony, however, established that modesty is rarely a problem when a medical history is being taken by a doctor.[304] Thus the Court finds this contention frivolous.

Plaintiffs' final major contention is that under the minimal requirements of the Supplemental Agreement, the Delaware Division will inexorably become racially identifiable. Specifically they argue that the Supplemental Agreement's patient assignment plan by ZIP code will cause overcrowding that can be alleviated only in such a way as to make the minority presence at the Delaware Division exceed 25%. The Court, for reasons stated earlier, finds that WMC will not violate the categorical requirement of the Supplemental Agreement that neither division shall become racially identifiable and that WMC will implement the necessary means to correct any potential overcrowding without making the Delaware Division racially identifiable. The Court further finds that WMC will be able to accomplish this with only a minimal administrative burden. In order to solve plaintiffs' overcrowding problem WMC need only shift approximately four patients a day from the Delaware Division to the Southwest Division.[305]

The Court has considered all other contentions proffered by the plaintiffs and has found them to be frivolous.

### F. Conclusions

The Court has thus concluded that Omega, as modified by the Supplemental Agreement, will have minimal negative impacts at most on the plaintiff classes. The Court has found no cognizable impact whatsoever upon the handicapped and utterly *de minimus* effects upon the elderly. Although the Court has found that Omega may have certain minor negative effects upon the quality of minority care, it has found that even when considered cumulatively these effects will be insignificant. The Court therefore holds that plaintiffs have failed to meet their initial burden of proving disparate impact under the civil rights statutes invoked upon any of the plaintiff classes.

Nevertheless, the Court will now assume *arguendo* that the minimal impacts upon minorities that have been discussed do make out a *prima facie* case under Title VI and will proceed to determine whether WMC has met its burden in rebuttal of showing legitimate needs that could not be met by a less discriminatory alternative.

### VI. WMC HAS MET ITS BURDEN OF GOING FORWARD WITH EVIDENCE SHOWING THAT OMEGA IS THE ONLY PLAN WHICH COULD MEET WMC'S PRESSING AND LEGITIMATE NEEDS

In order to meet its burden on rebuttal, WMC must produce evidence showing that

---

**303.** Tr. 2154–2155, 2218–2219. Plaintiffs themselves have implicitly admitted that one need not be trained in medicine to serve perfectly well as an interpreter between a patient and his or her doctor by arguing that Omega will have an adverse effect upon Hispanics because it will make family members, friends, and community workers unavailable to act as interpreters. These people are obviously untrained in medicine.

**304.** Tr. 2250.

**305.** Tr. 2694.

it has *bona fide* needs, that Omega will meet those needs, and that other less discriminatory plans will not. WMC has produced such evidence and the Court holds that, even assuming that a *prima facie* case has been established, WMC has met its burden of producing evidence to rebut that case.

### A. WMC Has Invoked *Bona Fide* Needs

The needs for the changes that will be effected by Omega have already been thoroughly discussed. The Court finds that these needs are real and legitimate and that Omega will meet them. They will be reviewed briefly below.

First, WMC has shown a need to renovate its facilities so that it can (1) preserve its qualification to receive federal funds, (2) preserve its educational program, (3) maintain its competitive position, and (4) bring itself into compliance with the State hospital code.[306] Omega will effect these renovations by building a new hospital and renovating the Delaware Division.

Secondly, WMC has shown a need to consolidate its beds and services into a single facility. The medical advantages of a one-roof facility or a plan coming as close to that ideal as possible were well established by extensive testimony. Plan Omega, with its 780–250 split of beds, comes as close to that ideal as is possible if the goal is to locate hospital facilities in both the suburbs and the city.[307]

WMC has, thirdly, established a need to provide hospital beds in both the city and the suburbs. It is undisputed that WMC's services are needed in the city and it has been established perforce that beds are needed in the growing Southwest.[308] WMC's Board of Directors recognized this dual need at an early stage of the planning process and committed itself to maintaining facilities in both areas.[309]

WMC has shown a fourth interest in keeping itself financially healthy. First, it must hold all costs down to enable it to keep its rates at a relatively low, affordable level while continuing to provide free care for the needy.[310] Secondly, WMC cannot undertake any enterprise which would financially jeopardize the institution's future. Omega can be completed within WMC's means and will allow WMC to hold its costs down.[311]

Finally, any plan which WMC adopts must have sufficient flexibility to allow the institution to expand in response to any increases in bed demand which might occur in New Castle County in the future. Omega is so designed.[312]

### B. Omega Is The Only Plan Which Can Adequately Meet WMC's Needs

The Court also finds that WMC has met its burden of going forward with evidence showing that it has chosen the least discriminatory alternative. WMC has shown that none of the six possible, less discriminatory[313] alternatives to Omega would adequately meet WMC's needs.[314]

---

306. *See*, Facts section, *supra*.

307. Tr. 1143, 1205, 1210, 1382–1384, 2051–2053, 2324–2325, 2158–2159; PX 1, pp. 6–9—6–10.

308. *See*, Facts section, *supra*.

309. DX 12.

310. Tr. 1373–1374, 2718–2726; DX 29.

311. Tr. 1476–1487, 1559–1560, 1709–1716, 2702–2747; DX 29.

312. Tr. 1403–1404, 1553, 1559–1560, 1903–1904.

313. The Court assumes for the purposes of this discussion that, as the plaintiffs argue, any plan leaving all beds or substantially more beds in Wilmington than does Omega would be less discriminatory.

314. A plethora of other plans varying according to the number, size, and location of the facilities could be devised. Indeed, WMC investigated approximately 50 different plans, all of which it rejected for *bona fide* reasons. (Tr. 1580–1606; DX 7). The Court need not and could not examine *all* less discriminatory alternatives. Those plans which the Court will not discuss here either obviously fail to meet WMC's needs or vary in only insignificant details from the ones which are considered.

The first possible less discriminatory alternative would be to do nothing. WMC would, however, still have to renovate its facilities at a considerable cost or lose its accreditation. Renovation would entail a loss of two hundred beds and a commensurate shortage of hospital beds in the community. The plan would, meanwhile, do nothing to consolidate WMC's facilities and would provide no beds in the Southwest. If, in fact, WMC were to do nothing, it is likely that another institution would build a 200 bed hospital in the Southwest.[315] Such a hospital would attract WMC's paying patients and siphon off WMC's revenues while leaving WMC's free care load unaltered and its costs substantially unchanged. Given this situation, WMC would be forced into making a choice between increasing rates to exorbitant levels and either discontinuing or substantially curtailing free care.[316] Thus, the do-nothing alternative is entirely unacceptable.[317]

The second possible less discriminatory alternative would be to renovate the present facilities and to build a new 200 bed hospital in the Southwest. This plan, however, would have the effect of imposing even greater fragmentation upon the Center with the concomitant disadvantages. In fact, the additional investment in the present facilities which this plan would entail would tie WMC into a fragmented pattern and would make the ideal of consolidation even more difficult to achieve in the future.[318] This four-roof plan was at one time proposed by WMC's Administration and Board of Directors but was withdrawn because of the vehement objections of the physicians on WMC's staff.[319] Thus, the Court concludes that it, too, would be unacceptable.[320]

A third alternative would be to build a single large hospital somewhere in the city. Such a plan would probably be neither physically nor financially feasible [321] and, in any case, would be clearly unacceptable because it would not locate any beds in the Southwest.

A fourth alternative would be to renovate the Delaware Division into a 450 bed hospital and to build a 570 bed hospital on the Southwest Site. This plan [322] was also advocated by WMC's administration at one point in the planning process.[323] It was, however, unacceptable to the Medical-Dental Staff who felt that such an even split would effect a permanent schism in the staff and would fail to achieve the benefits of consolidation.[324] The Medical-Dental Staff and the City of Wilmington were so dissatisfied with this plan that they approached WMC with a counter proposal for an 800 bed hospital in the city and a 200 bed hospital in the suburbs.[325]

The latter plan, a fifth possible less discriminatory alternative, would require the renovation and expansion of the Delaware Division into an 800 bed hospital and the construction of a 200 bed hospital in the Southwest ("Reverse Omega"). It would meet most of WMC's needs, allowing the

315. Tr. 1165–1166, 1407–1408, 1548–1549, 1765–1769. Local planning agencies would probably give approval to such a hospital. *See,* DX 6.

316. Tr. 1407–1408, 1548–1549, 2717–2726, 2737–2738; DX 29, Chart D.

317. *See also,* PX 1, p. 6–12; Tr. 1514–1515.

318. PX 1, pp. 6–12—6–13.

319. Tr. 1501–1511.

320. Variations of this plan which would involve closing one of the present divisions and building a new division in the Southwest (various three-roof plans) would be unacceptable for similar reasons. Such three-roof plans would merely exacerbate WMC's present fragmentation by making one division more remote from the others.

321. There may not be a site sufficiently large to accommodate a hospital that is not a high rise. (Tr. 1550–1574). Construction of a high rise would involve both prohibitively high construction costs and higher operating costs. (Tr. 1560).

322. *See,* DX 16.

323. Tr. 1378–1383, 1600–1605.

324. Px 1, p. 6–14.

325. Tr. 1378–1383, 1600–1605.

Center to achieve the maximum amount of consolidation possible, while locating beds both in the city and the suburbs. It would also give the Center enough flexibility to meet any future growth in demand. Reverse Omega is not, however, feasible because it would be prohibitively expensive. The architectural firm of Metcalf and Associates estimated that Reverse Omega would cost $179,315,776 [326] as compared with WMC's estimated $90,533,396 price tag for Omega. Costs for Reverse Omega could be cut somewhat, but by no more than ten to twenty percent.[327] Even if costs were cut by twenty percent, Reverse Omega would still require borrowing beyond the maximum of $73 million which WMC's finances could support.[328]

There are a number of factors which make Reverse Omega inherently more expensive than Omega. Ironically, the major reason for this inherent cost differential is the fact that Omega, unlike Reverse Omega, is able to maximize the savings that can be achieved from renovation.[329] Omega locates uses, such as nursing stations (inpatient rooms), which would require heavy remodeling if they were located in the Delaware Division (at a cost of 112% the cost of new construction) [330] in new construction in the Southwest Division. Moreover, it uses those same spaces left in the Delaware Division for offices and outpatient rooms, which require only moderate or minimum

renovation, at a cost only 80% or 30% the cost of new construction, respectively.[331] A second reason for the inherently lower cost of Omega is that it concentrates building in the suburbs where construction costs are lower.[332] Finally, Reverse Omega is inherently more costly because a number of especially costly systems are required to transform the Delaware Division into a completely integrated 800 bed facility.[333] Thus, the Court finds that WMC has met its burden of going forward with evidence showing that its choice of Omega over this alternative was justified on financial grounds.[334]

The final possible alternative would be to build a non-integrated or semi-integrated hospital beside the Delaware Division and a 200 bed hospital at the Southwest site—a modified Reverse Omega. Although this alternative was never studied in depth,[335] the Court finds that sufficient evidence was adduced to show that it, too, would fail to meet WMC's needs adequately. First, a non-integrated hospital would not achieve many of the benefits of consolidation. The idea of a second, free-standing hospital beside the Delaware Division was opposed by the Medical-Dental Staff, who vigorously made it known that it wanted a fully integrated hospital.[336] There is also evidence strongly suggesting that such a structure would be more costly than Omega. The Court can imagine two basic ways in which such a plan could be implemented.[337] First,

326. The study generating this estimate was a major one, costing WMC approximately $150,000. (Tr. 1380–1384). It generated the "Blue Book" (PX 17), a plan for an 800 bed Delaware Division and the "Green Book" (DX 17), a plan for a 264 bed Southwest Division. The "Green Book Modified" (PX 146), a plan for a 200 bed Southwest Division, was later based on this study.

327. PX 1, p. 6–14. The same types of cost-cutting measures could be taken for Reverse Omega as were taken for Omega. (See, Tr. 1709–1716.)

328. Tr. 1382, 1487, 1494, 1524–1526; PX 1, p. 6–14.

329. Tr. 1613–1614, 1709.

330. PX 17, p. 15.

331. Id.

332. Tr. 1559–1560; PX 1, p. 6–15; PX 411, p. IV–26.

333. PX 1, p. 6–14; PX 411, p. IV–14.

334. The Court has thus found that the defendants have produced sufficient evidence showing that the Blue Book plan or a similar one would be prohibitively costly and much more costly than Omega to throw the burden upon the plaintiffs to prove that that plan or another less discriminatory one would be feasible.

335. PX 1, pp. 6–14—6–15.

336. Tr. 1380–1381, 1733–1736, 2799–2800.

337. There are actually a large number of ways in which the plan could be implemented. All would be hybrids of the two considered by the Court.

the Delaware Division could be entirely renovated in such a way as to maintain its current number of beds and a 350 bed structure could be built beside it. This, however, would still be likely to be more costly than Omega because it would be unable to maximize the savings that can be had from renovation.[338] The second possible way to implement non-integrated Reverse Omega would be to retain Omega's 250 bed Delaware Division and to build a 550 bed hospital beside it. This would differ from Omega only in that the 800 new beds would be incorporated in two structures rather than one. That fact would make it significantly more costly than Omega.[339] In addition, any non-integrated Reverse Omega would involve more of the costly inner city construction than would Omega.[340]

The Court, therefore, concludes that WMC has met its burden upon rebuttal by showing that even if Omega may have some meager disparate impacts, those impacts are justified by *bona fide* needs which could not be accomplished by any less discriminatory plan.

## VII. PLAINTIFFS HAVE FAILED TO PROVE THAT A FEASIBLE ALTERNATIVE TO OMEGA IS AVAILABLE

The Court finds that the plaintiffs have failed to meet their burden of persuasion in showing that a less discriminatory alternative to Omega would, in fact, be feasible. Although plaintiffs aver that other alternatives, such as non-integrated Reverse Omega, would be feasible, they adduced evidence on only one alternative, i. e., Reverse Omega. The evidence produced by WMC indicating the infeasibility of other alterna-

tives thus remains unrebutted. The Court finds also that the evidence which plaintiffs produced on Reverse Omega does not make it appear more likely than not that that alternative would be a feasible one.

WMC's evidence of the infeasibility of Reverse Omega is convincing. First, WMC showed that certain features of Omega would make it inherently less expensive than a Reverse Omega plan. It also produced an elaborate and costly study of the feasibility of Reverse Omega, conducted by outside experts, which proved that the Reverse Omega plan would exceed WMC's estimated cost for Omega by some $89 million.[341] Finally, the accuracy of WMC's estimated cost for Omega is confirmed by the fact that WMC's contractors offered, in 1976, to complete the Southwest Division of Omega for $61,254,000.[342]

Rather than challenging the accuracy of these highly reliable estimates, plaintiffs claim that the large cost differential is due to the fact that the hospital complexes that the two plans would create would not be equal facilities. They claim that the Omega Plan hospitals would be inferior to the hospitals planned for Reverse Omega. Plaintiffs point to the fact that the plan studied by WMC for Reverse Omega was developed without the tight cost constraints that were imposed upon Omega. WMC's Board of Directors, in fact, never did attempt to develop a plan for Reverse Omega using the same parameters that were used for Omega.[343] The Board believed that this would be unnecessary because of its correct conclusion that certain characteristics of the

---

338. Renovation of the Delaware Division into a 450 bed hospital would require that all inpatient areas which do not comply with the various codes be renovated into complying inpatient areas, at a cost 112% the cost of new construction. Those spaces could then not be used to house office space or outpatient areas, which are located there under Omega at a cost considerably lower than the cost of placing them in new construction.

339. PX 1, p. 6–15.

340. *Id.*

341. Although plaintiffs produced other, lower estimates, including a preliminary estimate made by Metcalf and Associates before their more detailed study, the Court finds that the scopes of the studies producing these estimates were so limited as to make the estimates unreliable.

342. Tr. 3301–3302.

343. Tr. 1487–1497, 1994–1995, 3266–3268, 3344–3347.

two plans made Omega inherently less costly.[344]

Plaintiffs, therefore, through their expert in hospital planning and architecture, Mr. Juster, attempted to prove that if the same parameters were used for the two plans, Reverse Omega would be less costly than Omega. Mr. Juster testified that in order to compare the two plans as equivalents he could either reduce the scope of Reverse Omega or increase the scope of Omega. Because he believed that a comparison which was based upon an expansion of the Omega Plan would give WMC the benefit of the doubt,[345] Mr. Juster increased the scope of Omega, creating a plan that never existed and was never contemplated ("Imaginary Omega"). He concluded that Imaginary Omega would cost $152,332,386 while Reverse Omega would cost only $133,705,127.[346]

The Court finds Mr. Juster's estimates unreliable. It finds them unreliable first, because in devising his estimates Mr. Juster relied upon documents that were never designed for the purpose of making the comparison he was attempting. Consequently, he made many factual errors.[347] The unreliability of Mr. Juster's figures can be illustrated by a few examples. First, Mr. Juster included a financing charge in his derivation of the cost of the 800 bed Southwest Division of Imaginary Omega but failed to add the financing charge for any of the other three components. If this error alone were corrected, even Imaginary Omega would be slightly less expensive than Reverse Omega.[348] Mr. Juster also made a large number of other factual errors. In some cases he required alterations which were neither planned nor needed. For example, he included in the cost of the Imaginary Omega Delaware Division costs for renovating nursing unit rooms which under Omega will remain vacant and unused.[349] Similarly, he included costs for a Mosler Telalift and Materials Handling elevator, neither of which would be needed in a 250 bed hospital.[350] In another case, he imposed costs for renovation to a nursing unit on space that was intended for outpatient services which would require lower renovation costs.[351] These errors are illustrative of the many errors that Mr. Juster made.

Mr Juster's greatest error, however—the error which is primarily responsible for the Court's decision to give Mr. Juster's estimates no significant weight—was his failure to credit his Imaginary Omega with the main advantage that the real Omega plan has over any Reverse Omega plan. Mr. Juster allocated identical functions to his hypothetical 800 bed Southwest Division and his hypothetical 800 bed Delaware Division and identical functions to the two smaller components of the two plans. Thus, he failed to give Imaginary Omega the benefit of the fact that Omega concentrates functions for which renovation costs are at a minimum in the old building and functions for which new construction costs represent a minimum cost in new construction. Mr. Deehan explained that error at trial:

344. PX 1, p. 6–14; Tr. 1487–1497. The Court has found Omega to be inherently less costly for a slightly different reason from that expressed in the foregoing sources. The Court finds Omega less costly because it requires less costly types of renovations. The sources just cited believed it to be less costly because of a misguided belief that renovation would be inherently more costly.

345. Tr. 3030–3050.

346. Mr. Juster's estimates are found in his two reports, PX 317 and PX 411. The figures were summarized by Mr. Tyler in DX 32.

347. Tr. 3266–3268, 3344–3349. See generally, Tr. 1650–1671, 3273–3288.

348. When Mr. Tyler corrected this error for the two Reverse Omega Divisions, he derived a cost of $157,505,127 for Reverse Omega and retained Mr. Juster's estimate of $152,332,386 for Imaginary Omega. (Tr. 3308–3327; DX 32). Mr. Tyler failed to correct Mr. Juster's estimate for the cost of the Imaginary Omega Delaware Division. If the financing of that component is added, the cost of Imaginary Omega becomes $156,144,683.

349. Tr. 1657.

350. Tr. 1661, 1825–1833.

351. Tr. 1652.

A. By the way, the terminology that Mr. Juster uses, I believe, is very confusing. He calls this counterpart plan of the 800-bed Delaware Division and 264, 200-bed Southwest Division, reverse Omega. That is not reverse Omega.

Q. Why do you say that, sir?

A. Well, again, looking at page IV–3, you see a column marked "Omega," and you see another column marked "reverse" of that. They simply are the reverse of each other in terms of numbers. If you go behind those numbers and look at the program, they are totally different programs. There is a different allocation of activities under each program or each plan between the two sites.

Q. Now, are you saying—if you take Plan Omega and put the 780-bed division at 14th and Washington Streets and the 250-bed Delaware Division on I–95, that you haven't got a reverse Omega?

A. Not simply shifting the beds, because the Wilmington Medical Center does not consist only of the two items listed here, that is, 780 beds in one unit and 264 in another. You have to add clinics, administrative support space, executive offices, and so forth, which are not reflected in those bed numbers.[352]

Because it finds Mr. Juster's estimates highly unreliable and WMC's estimates highly reliable, the Court concludes that plaintiffs have not met their burden of persuasion in showing that it is more likely than not that Plan Reverse Omega would be within the means of WMC.

In fact, the Court has made its own attempt to sift through the welter of garbled facts relating to costs in order to determine cost estimates for Omega and Reverse Omega which give credit to Omega for the fact that it minimizes costs by locating different functions in different facilities and which attempts to correct some of Mr. Juster's factual errors. Using Mr. Juster's figures as a starting point, the Court derived an estimated cost for Omega of $128,397,735 and a cost of $145,243,311 for Reverse Omega, a difference of almost $17 million.

Even if the Court were to assume, as the plaintiffs' attorneys argue, that Mr. Juster's figures were premised on an inaccurate starting date and therefore over-inflated the costs of Reverse Omega, Omega would still be considerably less expensive, costing $127,806,551 compared to a cost of $139,-979,105 for Reverse Omega. While the Court, having witnessed the confusion of highly trained experts on these matters, will not guarantee that these figures are accurate in all respects, they do confirm the opinions of WMC's experts as well as the estimates adduced by WMC.

For the foregoing reasons, the Court finds that the plaintiffs have failed to show that WMC's justification of any discriminatory impacts is a pretense and concludes, therefore, that plaintiffs have failed in all respects to show a violation of Title VI, Section 504 or Section 6102. They have failed to make out a *prima facie* case under any of the three acts. Moreover, even assuming that the minimal impacts shown do make out a *prima facie* case, WMC has shown justification and plaintiffs have failed to meet their burden of persuasion of showing a feasible, less discriminatory alternative.

## VIII. CONCLUSION

This Court, after carefully considering the sufficiency and weight of the testimony adduced and the documentary evidence introduced at trial, finds that Plan Omega, like most human endeavors, is not a *perfect* plan for all users. It is, however, a comprehensive health care plan that is the *fairest* that can be achieved taking into consideration all the competing and sometimes conflicting needs of the entire community. Overall, Plan Omega will improve the delivery of health care for everyone and this will be accomplished without any substantial discriminatory effects upon the minorities, handicapped or elderly. Thus, based on the above findings of fact and conclusions of law, final judgment will be entered in favor of the defendant WMC and against the plaintiffs on all claims asserted in the Third Amended Complaint.

**352.** Tr. 3346–3347.